**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Donald M. KASS, M.D.,**
**Defendant-Appellant.**

No. 83–5433.

United States Court of Appeals,
Eleventh Circuit.

Sept. 6, 1984.

---

Mandina & Lipsky, P.A., Michael A. Lipsky, Miami, Fla., for defendant-appellant.

Stanley Marcus, U.S. Atty., Ira F. Gropper, Linda Collins-Hertz, Asst. U.S. Atty., Miami, Fla., Shelley Slafkes, Atty., Dept. of Health and Human Services, Atlanta, Ga., for plaintiff-appellee.

Before FAY and ANDERSON, Circuit Judges, and MARKEY *, Chief Judge of the Federal Circuit.

R. LANIER ANDERSON, III, Circuit Judge:

The United States sued Dr. Donald Kass to recover funds erroneously paid to him for provision of services under the Medicare program. The district court entered summary judgment for the government. Because we conclude that the suit was not filed within the six-year statute of limitations provided by 28 U.S.C.A. § 2415(a) (West 1978), we reverse.

## I. BACKGROUND

Title XVIII of the Social Security Act, popularly known as "Medicare," 42 U.S.C.A. § 1395, et seq. (West 1983), consists of two distinct payment programs. Part A provides for payment for in-patient hospital benefits and related post-hospital benefits. 42 U.S.C.A. § 1395c, et seq. Part B establishes a voluntary supplemental insurance program principally intended to reimburse eligible individuals, or doctors holding assignments from them, for other medical expenses. 42 U.S.C.A. § 1395j, et seq. This case involves overpayments allegedly

* Honorable Howard T. Markey, Chief Judge, U.S. Court of Appeals for the Federal Circuit, sitting    by designation.

made to a doctor under Part B of the program.

Part B is administered through private fiscal intermediaries, known as "carriers." 42 U.S.C.A. § 1395u. The carriers, in this case Blue Shield of Florida, Inc., are contractually obligated to the Secretary of Health and Human Services to receive claims, determine the appropriate coverage, and make payment from the Supplementary Medical Insurance Trust Fund. 42 U.S.C.A. §§ 1395u(a), 1395t. Claims for medical services will not be paid unless the physician certifies that the services were "medically required." 42 U.S.C.A. § 1395n(a)(2). The carrier must review these claims to insure that costs charged are reasonable. 42 U.S.C.A. § 1395u(b)(3). Because of the lengthy time period required for such review, the claims are generally paid by Blue Shield upon receipt of the physician's certificate and only investigated after payment.

Dr. Donald Kass, a Florida physician, submitted claims to Blue Shield for services rendered under Part B of the Medicare program during 1970–72. After reimbursement, Blue Shield noticed that Kass' claims significantly exceeded the norm, as shown by the use of "profiles" developed by the carrier to assist in its required review. Blue Shield notified Kass of its concern by a letter dated March 19, 1973, and requested that he provide various records for further investigation.[1] The letter also stated that if the additional records did not mollify the company's concerns, the matter would be referred to the Florida Medical Foundation, an independent organization of doctors that provides peer review of cases in which Medicare overcharges are suspected.[2]

Following the submission of records by Kass, his claims for 1970–71 were "thoroughly reviewed" by Blue Shield. Affidavit of Buddie Rivers, Department of Health and Human Services. On February 6, 1974, Blue Shield notified him that "there exists the possibility that your billings for patients covered by the Medicare program show a level of utilization somewhat greater than that of similar physicians." For this reason, the claims were referred to the Florida Medical Foundation for peer review.

The Foundation provides peer review on county and state levels. On February 13, 1974, Kass met with the Dade County panel. That panel concluded that the doctor has improperly overutilized Medicare reimbursement in 1970–71 and, by letter of June 21, 1974, it reported this finding to the state review committee. The state committee reviewed the conclusions and agreed. This ultimate conclusion was communicated to Blue Shield on September 4, 1974.

From September, 1974, until August, 1975, Blue Shield performed further investigation. First, it translated the Florida Medical Foundation's finding of "overutilization" into a specific monetary figure representing the extent of such overcharge for 1970–71. Then, it applied the findings of the Foundation to an investigation of Kass' 1972 claims, and reached a determination of overcharge for that year as well. The investigation concluded on August 5, 1975, with a determination that Kass received

1. The additional records are requested because the utilization profiles are very general, indicating when a doctor has claimed a reimbursement for services which exceed, by some comparative measure, those generally claimed by the medical community. Because there may be many valid reasons for a "high" claim, the records are necessary to explore the possible causes for the large figure.

2. 42 U.S.C.A. § 1395u(a)(2)(B) obligates the Secretary of Health and Human Services to assist carriers in the development of techniques for reviewing "utilization practices," i.e., doctors' claims for Medicare reimbursement. The use of peer review panels is one common means of providing such review. Such review is not mandatory, and a physician can choose to forego it and simply abide by the decision of the carrier. Because the panels are made up of community physicians, however, they can be a good forum for explaining the need for questioned medical services. The ultimate recommendations of peer review panels, while certainly persuasive, are not binding upon the carrier.

overpayments totalling $30,111.88 in the years 1970–72.

By letter of October 10, 1975, Blue Shield notified Kass of the final determination. The letter also notified Kass of his right to seek an administrative hearing within 6 months if he disagreed with the determination.[3] He did not do so. The government made some unsuccessful attempts to collect the debt. It finally filed this contract action on April 12, 1982.

Kass filed a motion to dismiss, arguing that the government did not bring suit within the 6-year time period provided by 28 U.S.C.A. § 2415(a) (West 1978). The district court rejected this claim, holding that the government was not able to bring suit until the 6-month period for requesting an administrative hearing had passed. This period lapsed on April 10, 1976, and, in the district court's view, the government had 6 years from that date in which to bring suit. Because April 10, 1982, was a Saturday, the time for filing suit was extended until Monday, April 12. Fed.R. Civ.P. 6(a). The government filed suit on that day. Following the resolution of this issue, summary judgment was granted for the government.

## II. ISSUE

The sole issue before this court is whether the government's cause of action was brought within the period prescribed by 28 U.S.C.A. § 2415(a).

## III. LIMITATION PERIOD FOR CONTRACT ACTIONS BY THE UNITED STATES

■ Our analysis necessarily begins with a review of the statute. 28 U.S.C.A. § 2415(a) provides as follows:

Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages which is brought by the United States or an officer or agency thereof, which is founded upon any contract, express or implied in law or fact, shall be barred unless the complaint is filed within 6 years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later . . . .

The statute thus grants an *automatic* six-year period from the accrual of the cause of action. In addition, an action may always be brought within one year of final administrative decision even though that time may be outside of the six-year period.

Also relevant to the determination of this action's timeliness is 28 U.S.C.A. § 2416(c):

For the purpose of computing the limitations periods established in § 2415, there shall be excluded all periods during which . . . facts material to the right of action are not known and reasonably could not have been known by an official of the United States charged with the responsibility to act in the circumstances . . . .

These statutes were enacted in 1966, prior to which there were no statutes of limitation for the majority of government actions. The limitation period was designed to promote diligence by the government in bringing claims to trial and also to make the position of the government more nearly equal to that of a private litigant. *See United States v. Cardinal*, 452 F.Supp. 542 (D.Vt.1978); S.Rep. No. 1328, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.

---

**3.** The administrative hearing referred to is that required by 42 U.S.C.A. § 1395u(b)(3)(C). Although the statutory provision and supporting regulations, 42 C.F.R. § 405.801, *et seq.* (1983), indicate that the administrative hearing was meant to be provided *before* payment of claims rather than as a forum for disputing reimbursement determinations, *see Szekely v. Florida Medical Association*, 517 F.2d 345, 348 (5th Cir. 1975) ("The hearing and review there provided to determine if payment is proper are to be utilized prior to payment and not subsequently"), Blue Shield's practice of paying first and investigating later has turned the hearing into a post-payment review mechanism. The importance of that hearing is still great; it is the only forum for disputing a determination of overcharge due to the unavailability of judicial review for Medicare payment decisions. *See United States v. Erika, Inc.*, 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982); *United States v. Sanet*, 666 F.2d 1370 (11th Cir.1982).

Code Cong. & Adm.News, p. 2502, *et seq.* (hereinafter "Cong.News").

In applying the 6-year prong of the statutory period to a government contract action, the first question to be asked is when "the right of action accrues." 28 U.S.C.A. § 2415(a). The general rule in contract actions is that the cause accrues at the time of the breach. *United States v. Bragg,* 493 F.Supp. 470, 475 (M.D.Fla. 1980); 51 Am.Jur.2d Limitation of Actions § 126, p. 695 (1970). *See also Aetna Casualty and Surety Co. v. Board of Public Instruction,* 195 So.2d 41, 42 (Fla.App. 1967); *R.L. Sanders Roofing Co. v. Miller,* 153 Ga.App. 225, 264 S.E.2d 731, 732 (1980); Cong.News at 2508 (noting state law antecedents of § 2415).

Once the date of the breach has been determined, however, the additional inquiry required by § 2416(c) must be made. As long as "facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances," the 6-year period will be tolled.

We now proceed to examine the facts of this case, focusing particularly upon the determination of when the government had the requisite "material facts" regarding its cause so as to terminate the tolling effect of § 2416(c).

## IV. APPLICATION OF THE STATUTE

■ This cause of action accrued when the government overpaid Kass for claimed Medicare services which were not medically necessary. *United States v. Bragg,* 493 F.Supp. 470, 475 (M.D.Fla.1980). An examination of the legislative history of § 2416(c) is helpful in specifying the period during which the running of the statute was tolled.

■ Although one motivation behind enacting a time limit on government-prosecuted civil actions was the desire to inspire diligence in discovering claims, Congress also intended that the government should not be penalized for excusable ignorance of such claims. Foremost in the enactment of § 2416(c) was the thought that the government should not be penalized if the *fraud* of an adverse party restricted its ability to discover a valid cause of action until long after its accrual. Cong.News at 2507 ("The committee understands that the principal application of this exclusion will probably be in connection with fraud situations.").

Beyond the instance of fraud, Congress was not explicit about how far the tolling provision should extend. It expressed a willingness to excuse some delay caused by "the size and complexity of the Government," Cong.News at 2507, by including in § 2416(c) the language "reasonably could not be known by an official of the United States *charged with the responsibility to act in the circumstances*" (emphasis added). This clause recognizes, as a practical matter, that knowledge of a cause of action at one level of government is not always immediately communicated to the particular officials charged with acting upon it. Congress could not, however, be completely forgiving of government delay and still be true to its motives in enacting a statute of limitations. Therefore, it is not necessary that relevant officials have all details of a claim before the statutory period begins to run; once the facts making up the "very essence of the right of action" are reasonably knowable, the § 2416 bar is dropped. Cong.News at 2508.

■ In examining the facts of this case, we conclude that the § 2416 bar terminated and the 6-year statute of limitations began to run, at the very latest, on September 4, 1974, when the Florida Medical Foundation notified Blue Shield of its finding that Kass had "overutilized" Medicare in 1970 and 1971. *See United States v. Bragg,* 493 F.Supp. 470 (M.D.Fla.1980). Even though such a conclusion was not binding on Blue Shield, it persuasively confirmed the initial concern (developed in the course of a thor-

ough review of Kass' records) that Kass was overcharging the Medicare program. The finding highlighted particular types of services for which overcharges were made, thus providing Blue Shield with sufficient direction for close scrutiny of the 1970–72 records.[4] At least as early as September 4, 1974, the government, through its agent Blue Shield, had the facts making up the "very essence of the right of action."[5] Because the suit was not filed for almost eight years thereafter, it was barred by § 2415(a).

The district court resolved this question by holding that the government had six years from April 10, 1976, which it deemed to be the date of the final administrative decision in this case. This result was an incorrect interpretation of the statute. Section 2415 clearly provides that an action shall be brought within six years of accrual or within one year of administrative action,[6] *whichever is later.* Allowing the government six years after the administrative decision effectively read the one-year prong out of the statute. *United States v. Skidmore, Owings & Merrill,* 505 F.Supp. 1101, 1105 (S.D.N.Y.1981). Such a reading violated the congressional intent explicit in the statutory language.

The district court was led to this result by reliance upon *Crown Coat Front Co. v.*

*United States,* 386 U.S. 503, 513, 87 S.Ct. 1177, 1183, 18 L.Ed.2d 256 (1967). In *Crown Coat,* a private party entered into a contract with the government and then sought an equitable adjustment of the terms following the government's reduction of its payment. The contract provided that such adjustments would be determined by an administrative proceeding and that the result could be challenged by civil suit. Immediately following an administrative decision against the private party, a civil suit was filed. The government moved to dismiss, claiming that the action was barred by 28 U.S.C. § 2401(a) (West 1978), which requires contract suits against the government to be brought within six years. That statute, unlike § 2415, contains no alternate one-year provision for suits following administrative action.

Recognizing that the accrual of a cause of action is to be "interpreted in the light of the general purposes of the statute and of its other provisions, and with due regard to those practical ends which are to be served by any limitation of the time within which an action must be brought," 386 U.S. at 517, 87 S.Ct. at 1185, quoting *Reading Co. v. Koons,* 271 U.S. 58, 62, 46 S.Ct. 405, 406, 70 L.Ed. 835 (1926), the Court in *Crown Coat* held that the private party's cause of action did not accrue until the termination of the administrative proceed-

---

4. Although the Florida Medical Foundation's report to Blue Shield only contained recommendations based on review of the 1970 and 1971 records, the findings also put the carrier on rather specific notice of possible overcharges during 1972. This conclusion is supported by the following response by the government to an interrogatory served by Kass.

> 4. Please state the exact date that you discovered that this defendant committed Medicare overutilization, regardless whether the amount at that time was determined or undetermined.
>
> *Answer:* The possibility of overutilization first suspected by plaintiff's carrier, Blue Shield of Florida, Inc., on March 19, 1973, was confirmed when the Florida Medical Foundation reported its peer review findings to the carrier on September 4, 1974.

5. The facts making up the "essence" of the cause may have been reasonably knowable by the

government before September, 1974. When Blue Shield first referred Kass' claims to the Florida Medical Foundation in February, 1974, it had already noted irregularities in his claims, sought and obtained records from him, and conducted a two-tier internal review of his claims. While no final determination could have been made as of February, 1974, the carrier's well-founded suspicions may have been sufficient to trigger the running of the statute. We need not decide this, however, because even choosing the latest possible date, *i.e.,* September 4, 1974, the suit was barred.

6. Assuming arguendo that the final administrative action was on April 10, 1976 (the date on which Kass' ability to request a hearing expired), it is clear that the government did not file within one year. For this reason, our central concern in this case is with the commencement and termination of the six-year period.

ing. The holding was limited to the particular facts and statute, however, and the unanimous court explicitly recognized that the recently enacted § 2415 was a different issue altogether because it specifically accounted for delay caused by administrative action. 386 U.S. at 519–22, 87 S.Ct. at 1186–1187. We therefore decline to transplant *Crown Coat's* decision that accrual begins at the close of administrative action into the foreign soil of § 2415.

Because the government failed to file suit either within six years of its reasonable knowledge of the claim or within one year of final administrative action, the suit was barred.[7]

### III. CONCLUSION

For the foregoing reasons, we reverse the district court's grant of summary judgment to the government. We remand with instructions that judgment be entered for Kass.

REVERSED and REMANDED.

---

**7.** While presented in a different context, our resolution bears similarity to decisions interpreting "accrual" under § 2415(a) for contract actions on overpayment to hospitals and nursing homes under Part A of the Medicare program. Under Part A, "providers" are reimbursed during the year not on the basis of services performed, but rather on the basis of *estimated* services. 20 C.F.R. § 405.454 (1983). At the end of the year, the provider must submit cost reports and a required audit is undertaken to determine whether the estimated payments have exceeded or fallen short of the actual costs. Because the existence of any liability is unknown until this audit, most courts have found that the action accrues for purposes of § 2415(a) when the audit is completed. *See United States v. Pisani,* 646 F.2d 83, 89 (3d Cir.1981); *United States v. Withrow,* 593 F.2d 802, 805 (7th Cir.1979). *But see United States v. Gravette Manor Homes,* 642 F.2d 231 (8th Cir. 1981) (finding that cause of action accrued not upon audit but rather upon later approval of audit results by Blue Cross official responsible for making payments). In the Part A context, the final audit provides the first notice of overpayment, just as the Medical Foundation report constituted notice of the essence of the cause of action in this case.