**UNITED STATES of America, Plaintiff,**

v.

**Paul RUEGSEGGER, M.D., Defendant.**

**No. 86 Civ. 7755 (KC).**

United States District Court,
S.D. New York.

Dec. 15, 1988.

Bernard W. Bell, Asst. U.S. Atty., New York City, for plaintiff.

Jerome R. Halperin, P.C., New York City, for defendant.

## OPINION AND ORDER

CONBOY, District Judge:

In this action, the government seeks to recover $35,070.40 in Medicare payments made to defendant Paul Ruegsegger, a physician, for allegedly unnecessary medical services rendered in 1978 and 1979. The government now moves for summary judgment, arguing that the existence and amount of the overpayments has already been conclusively determined in an administrative proceeding. Ruegsegger cross-moves for summary judgment dismissing the complaint on the ground that the action is barred by the statute of limitations.

## BACKGROUND

Part B of the Medicare Program is a federally subsidized health insurance system implemented through private insurance carriers who contract with the government. The carriers reimburse physicians for their "reasonable charges" determined in accordance with the Medicare Act and regulations promulgated pursuant thereto. Although carriers are required to review claims to make sure they are reasonable, overpayment investigations under Part B, when they occur, are usually commenced after reimbursement.

Empire Blue Cross and Blue Shield ("Blue Cross"), a Medicare carrier operating in New York State, uses a computer program to flag potential over-utilization of medical procedures. The program compares an individual physician's practices with statistical "norms" or composites of the nature and frequency of procedures utilized by the physician's peers in the same locality. If the computer indicates that a physician is above the norm for a particular procedure, it means that he reported the procedure more frequently per 100 patients than 96% of his peers.

In 1976 Blue Cross suspected that Ruegsegger had over-utilized—and thus had been overpaid for—certain medical procedures. Blue Cross referred the matter to the New York County Medical Society's ("NYCMS") Peer Review Committee which reviewed the defendant's pattern of practice and concluded that he provided medically unnecessary services to Medicare patients.[1] As a result of the finding, defendant refunded $11,004 to Blue Cross.

In 1979, the computer flagged defendant's procedures for 1978 as exceeding by nearly 80% the computer-generated statistical norms. In 1980, the computer again flagged defendant's 1979 procedures as exceeding the statistical norms, also by nearly 80%.

On March 28, 1980, Blue Cross decided to refer Dr. Ruegsegger's case to the NYCMS Peer Review Committee for their advice regarding whether some or all of his services were unreasonable and unnecessary. Of the 61 Medicare patients treated by Ruegsegger in 1978, Blue Cross determined that 40 had visited the doctor 5 or more times in that year. Of those 40, Blue

---

1. The use of peer review panels in the claims investigation procedure was explained in *United States v. Kass,* 740 F.2d 1493, 1495 n. 2 (11th Cir.1984):

   42 U.S.C.A. § 1395u(a)(2)(B) obligates the Secretary of Health and Human Services to assist carriers in the development of techniques for reviewing "utilization practices," *i.e.,* doctors' claims for Medicare reimbursement. The use of peer review panels is one common means

   of providing such review. Such review is not mandatory, and a physician can choose to forego it and simply abide by the decision of the carrier. Because the panels are made up of community physicians, however, they can be a good forum for explaining the need for questioned medical services. The ultimate recommendations of peer review panels, while certainly persuasive, are not binding upon the carrier.

Cross selected 10 for evaluation by the Peer Review Committee.

Ruegsegger first appeared before the Peer Review Committee on July 16, 1980 but that session was cut short after about 40 minutes when the committee discovered that Ruegsegger was tape recording the proceedings. Before adjourning the meeting, however, the committee offered to reschedule the session, minus the tape recorder, if Ruegsegger so desired. The committee also informed him that he could bring a lawyer the next time. By letter dated July 25, the Peer Review Committee informed Blue Cross that Ruegsegger had been uncooperative at the July 16 meeting and that, to date, he had declined the committee's offer of a new hearing. The committee indicated that Blue Cross would have to make a final determination without its input if Ruegsegger did not cooperate. Following his receipt of a copy of that letter, Ruegsegger had a change of heart and agreed to a second hearing before the Peer Review Committee. A second hearing was held on October 15, 1980.

By letter dated October 20, 1980, the committee informed Blue Cross of its conclusion:

> Our initial impression is that this was a medically stable group of patients who did not need the excessive amount of care they received, and it was the unanimous opinion of the committee that there has been gross over-utilization of office visits, laboratory tests, cardiograms and x-rays. The need for the diagnostic studies and therapeutic measures were not documented in the records by clear cut changes in the patients' conditions.

Based on that letter, Blue Cross tentatively determined that Ruegsegger had received $35,070.40 for unnecessary medical services. Nonetheless, before rendering a final decision, Blue Cross invited Ruegsegger "to present any facts or data which you may feel will affect our determination." Ruegsegger indicated that he would submit additional information in defense of his medical practices but he requested that he first have an opportunity to review Blue Cross' records. The requested records, along with an explanation of the carrier's computerized statistical calculations, were mailed to the doctor. Over 5 months later, on May 22, 1981, Ruegsegger's counsel wrote back saying that the requested computer data was illegible. Blue Cross sent him a second copy of the allegedly illegible computer data but warned Ruegsegger that its review could not be extended much longer. Despite his receipt of a second copy of the computer data, Ruegsegger apparently did not submit any further facts or data to Blue Cross. By letter dated July 15, 1981, Blue Cross indicated that its overcharge · determination was final and informed Ruegsegger of his right to seek a "fair hearing" within 6 months. *See* 42 U.S.C. § 1395.[2] On January 7, 1982, Ruegsegger invoked his right to a fair hearing at which he could challenge the carrier's determination.

In his letter requesting a fair hearing, Ruegsegger indicated that he would call expert witnesses and submit documents at the hearing to support his position that the alleged overpayments were for necessary and proper medical services. In response to his letter, Blue Cross asked Ruegsegger to provide the medical records of the ten patients whose cases were reviewed by the peer panel. By letter dated January 22, 1982, Ruegsegger informed Blue Cross that he would only provide the records of one patient (the "Grossman case") since, in his view, the peer review panel only analyzed that case. It was Ruegsegger's position that the fair hearing could or should function only as an appellate body, reviewing in-depth determinations made, in the first instance, by the Peer Review Committee.

An initial hearing was conducted before hearing officer William Woodson on October 20, 1982. At that session, evidence was taken only as to the Grossman case be-

2. According to the government, Blue Cross first informed the Health Care Financing Administration ("HCFA"), the agency responsible for collecting Medicare overpayments, of the matter on December 17, 1981, approximately 6 months after Ruegsegger was notified of Blue Cross' final determination.

cause Ruegsegger had not produced the other 9 files for review nor had he submitted them to Blue Cross' Medical Advisory Staff.[3] At the close of the hearing, Woodson asked Ruegsegger to furnish the other 9 files so that the hearing could be resumed, at which time the hearing officer would conduct a *de novo review of the remaining 9 cases.* The records were not produced. In a letter dated December 9, 1983—more than one year after the initial hearing—Woodson informed Ruegsegger's counsel of the consequences of not producing the records:

> In the event that the records are again not furnished, I will cancel the scheduled further hearing and proceed to affirm the remaining nine cases on the presumption that the records would be adverse to the claimant [see 20 *C.F.R.,* § 1405.252(a)] and will proceed to consider and decide the Grossman case on the merits.
>
> *I want to repeat what I think I had already made clear at the last hearing, viz. that I am not in any sense bound by the recommendation of the Medical Society Committee (which obviously did not consider any of these cases in the depth which would be appropriate at the hearing) and I will make my own determination as to medical necessity based upon the evidence presented at the hearing. Let us get down to the merits and stop talking about past history.*

(emphasis added). Ruegsegger's counsel responded by letter dated December 16, 1983 in which, among other things, he questioned Woodson's authority to hold a *de novo* hearing (although the matter was before Woodson precisely because a hearing was requested), complained about his lack of access to Blue Cross' data base and methodology in initially selecting cases for review, and insisted that an off-set placed on Ruegsegger's future Medicare claims be withdrawn pending the outcome of the hearing. For the first time, he also suggested that Ruegsegger might want more than the original 10 cases reviewed by

Woodson. Coming more than a year after the first session, Woodson rejected Ruegsegger's attempt to expand or alter the scope of the hearing. Woodson also noted that he had no authority to vacate the off-set on future payments. Finally, he pointed out, for the second time, the irrelevance of the information sought from Blue Cross:

> The information you request has no bearing on the only issue which I regard as relevant: Were all of the services in these ten cases medically necessary? What we need for the resolution of this issue are copies of Dr. Ruegsegger's office records in these cases and then expert testimony *pro* and *con.*

In his final communication to Woodson, Ruegsegger's counsel asserted that Ruegsegger was withdrawing from the process, principally because Ruegsegger had not received a proper hearing by the Peer Review Committee thus depriving him of his constitutional right "to a (1) 'fair' hearing *and* (2) a *proper* Peer Review hearing." Shortly thereafter, Woodson affirmed the carrier's overcharge determinations. This action was commenced by the filing of a complaint on October 8, 1986.

## DISCUSSION

### I. Statute of Limitations.

The parties agree that the government ordinarily must commence an action to recover an overpayment within 6 years of the date "the right of action accrues." 28 U.S.C. § 2415(a). Under Part B of the Medicare Program, the right of action is deemed to accrue when the alleged overpayment is made. *United States v. Bragg,* 493 F.Supp. 470 (M.D.Fla.1980). If the statute of limitations ran without interruption from the date of the last alleged overpayment to Ruegsegger (sometime in 1979), than the government's action is time-barred since the complaint was not filed with this court until October 8, 1986. The government contends, however, that its

---

**3.** Having earlier opted to send the matter to an independent peer association, see note 1, *supra,* Blue Cross' internal Medical Advisory Staff had never requested or received Ruegsegger's files.

claims are saved by the tolling provision of 28 U.S.C. § 2416(c):

> Section 2416. Time for commencing actions brought by the United States; exclusions.
>
> For the purpose of computing the limitations periods established in section 2415, there shall be excluded all periods during which....
>
> (c) facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to · act in the circumstances....

The government maintains that the statute of limitations was tolled until December 17, 1981 at which time HCFA, the government agency "charged with the responsibility to act in the circumstances," was first informed of the matter. Alternatively, plaintiff argues, even if Blue Cross should be viewed as "an official of the United States" for purposes of commencing the period of limitations, the facts material to the government's right of action were not known and could not reasonably have been known until the Peer Review Committee issued its report to the carrier in November of 1980. If so, the government's claims are timely.

Defendant contends that Blue Cross' knowledge should be imputed to the government for purposes of commencing the limitations period and that Blue Cross knew or should have known of the alleged overpayments during the Spring and early Summer of 1980 after it had a chance to complete its "usual multi-tiered, in-depth, retrospective review" of the defendant's computer profile. Defendant's Memorandum of Law at 24. This is especially true, defendant argues, in light of the carrier's knowledge of defendant's over-utilization of services in 1976. If Defendant is correct, than the government filed its complaint in this action several months after the expiration of the applicable limitations period. For the following reasons, the Court concludes that this action was commenced within the 6 year limitations period.

■ " 'Statutes of limitations sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government.' " *Badaracco v. Commissioner,* 464 U.S. 386, 391, 104 S.Ct. 756, 761, 78 L.Ed.2d 549 (1984) (quoting *E.I. Dupont de Nemours & Co. v. Davis,* 264 U.S. 456, 462, 44 S.Ct. 364, 366, 68 L.Ed. 788 (1924)). With this principle in mind, and given the arguably plain statutory requirement that "an official of the United States charged with the responsibility to act in the circumstances" have at least constructive knowledge of an overpayment before the limitations period commences, there is some appeal to the government's argument that an employee of HCFA, rather than simply an employee of a private insurance carrier, must have notice of the claim before the limitations period will run. On the other hand, there is no support in this circuit for the government's literal reading of the tolling provision, and in the 11th Circuit cases relied on by both parties, the Court presumes, without discussion, that Medicare carriers are agents of the government for purposes of the statute of limitations.[4] Because the Court concludes, however, that the government had constructive knowledge of their right of action no earlier than the date Blue Cross received the peer review report, we need not address the government's more restrictive interpretation of §§ 2415–16.

In *United States v. Kass,* 740 F.2d 1493 (11th Cir.1984), the government sued a physician to recover payments for allegedly unnecessary medical services rendered from 1970 to 1972. After the payments were made, the carrier, Blue Cross, noticed that Kass' reimbursement claims significantly exceeded the norm for the services rendered.[5] Blue Shield notified Kass and asked him to provide records for further investigation. After "thoroughly" reviewing his records, Blue Shield referred the

---

4. In addition, the rule supported by the government would insulate it from the consequences of a carrier's unreasonable delay in notifying HCFA.

5. Apparently, claims were compared to statistical "profiles" similar if not identical to the computer generated statistical norms utilized by the carrier in this case.

matter to a peer review panel in February of 1974. In September of that year, the peer review panel informed Blue Shield that, in its opinion, Kass had over-utilized certain Medicare-insured procedures. Blue Shield further investigated the matter for approximately another year at the end of which Blue Shield concluded that Kass owed $30,111.88. In October of 1975, Kass was informed of the carrier's final determination and advised of his right to seek an administrative hearing within 6 months. After several unsuccessful attempts to collect the debt, the government filed an action in April of 1982. Based on its conclusion that the statute of limitations was tolled until the 6 month period for seeking a fair hearing elapsed, the district court denied Kass' motion to dismiss and Kass appealed.

In reversing, the Court reasoned that in determining the date upon which the government should be charged with constructive knowledge of an overpayment, "it is not necessary that relevant officials have all details of a claim before the statutory period begins to run; once the facts making up the 'very essence of the right of action' are reasonably knowable, the § 2416 bar is dropped." *Id.* at 1497. At the latest, the Court found, the facts making up "the very essence of the right of action" were reasonably knowable when Blue Shield received the peer review panel's report in September of 1974, more than 6 years before the action was commenced. The court noted that the government may have received constructive knowledge of the overpayments on an earlier date because Blue Shield had already discovered irregularities in Kass' claims, and had sought, obtained, and carefully reviewed his records by the time the matter was referred for peer review in February of 1974. *Id.* at 1497–98 & n. 5. It was, however, unnecessary to consider this earlier date because the action was time barred even if the operative date was September 1974.

In contrast, in *United States v. Diaz,* 740 F.2d 1491 (11th Cir.1984)—a case filed on the same date as *Kass*—the choice between the date a Medicare carrier received a peer review report and the date the carrier completed an earlier internal investigation would determine whether the government's reimbursement action was timely. There, the government sought reimbursement from a doctor suspected of obtaining overpayments from 1973 to 1975. After the carrier, Blue Shield of Florida, noticed Diaz's deviations from the "norms," it requested his records "and performed 'an indepth postpayment review' of his claims." *Id.* at 1492. The review did nothing to dispel the carrier's suspicions and the matter was referred to a peer review panel of the Florida Medical Foundation. In June of 1976, Blue Shield was notified of the panel's conclusion that Diaz had substantially over-utilized certain medical procedures. In March of 1977, after 10 more months of internal analysis, Blue Shield concluded that Diaz owed $25,342 and demanded reimbursement in that amount. Diaz neither paid nor sought administrative review of the carrier's determination. The government filed suit in May of 1982.

The district court denied Diaz's motion to dismiss, ruling that the limitations period did not commence until Blue Shield rendered its final determination of liability in March of 1977. On appeal, the Court reversed and remanded the case to the district court for further findings of fact. Although, unlike in *Kass,* the carrier received the peer review panel's report less than 6 years before the lawsuit commenced, the Court noted that in *Kass* it "held that the state peer review report to Blue Shield was the *latest* possible date for initiating the running of the six year period." *Id.* at 1493. On remand, the district court was directed to determine if the carrier had constructive knowledge of the overcharges before June of 1976.

In a more recent decision, *United States v. Beck,* 758 F.2d 1553 (11th Cir.1985), the 11th circuit refined the test set forth in *Kass* and *Diaz.* There, Blue Cross made a preliminary determination in 1974, apparently based on its "norms" profiles, that Beck may have been overpaid for claims filed in 1972. The carrier notified Beck and, pursuant to the carrier's request, Beck

submitted his medical records on the 1972 claims. On June 5, 1975, Blue Cross forwarded the matter to a peer review panel which, on March 19, 1976, notified Blue Cross that Beck had indeed been overpaid. After Beck declined an offer to present his side of the matter to the peer review panel, the panel returned Beck's files in September of 1976 and Beck's claims were subject to further review by Blue Cross examiners. On October 10, 1977, Blue Cross informed Beck that he owed $10,066.43. Although his request for an administrative fair hearing was untimely, Blue Cross agreed to meet with Beck and eventually reduced their demand to $5,395.15. On December 12, 1978, Beck was notified of the adjusted demand. He did not respond nor did he seek administrative review. He also ignored a follow-up letter dated February 12, 1979, and a final letter dated June 21, 1979. The government filed suit on April 24, 1981. Beck moved for summary judgment arguing, *inter alia*, that the action was time-barred. The district court denied the motion ruling that the government's right to enforce its claim did not accrue until after the peer review process had been completed and Beck's files had been returned to Blue Cross. On appeal, the 11th Circuit explained *Kass* and *Diaz*:

> We concluded in *United States v. Kass*, 740 F.2d 1493, 1497 (11th Cir.1984), that "it is not necessary that relevant officials have all details of a claim before the statutory period begins to run; once the facts making up the 'very essence of the right of action' are reasonably known, the section 2416 bar is dropped." The "very essence" of a right of action for recoupment of overpayments made on Medicare claims is the payment of claims which are not "reasonable and necessary." Thus, our inquiry must focus on the point at which the government became aware, or reasonably could have been aware, that Beck had been paid for claims which were not "reasonable and necessary."

A carrier determines the reasonableness and necessity of services rendered in connection with Medicare Part B claims by comparing a physician's practice to the prevailing practices of similar practitioners in the physician's geographical area. This is the purpose for which physician utilization profiles were developed. Utilization profiles alert a carrier to the *possibility* of over-utilization of the Medicare program by a physician. *It is only when a physician has been given an opportunity to explain why certain services were rendered and the carrier has reviewed the claims individually that a determination can be made as to the reasonableness and necessity for the services.* A carrier is often unable to make this determination on its own. It is in these instances that the peer review process becomes particularly important.

The peer review process gives both the carrier and the physician the benefit of the expertise and knowledge of other practitioners in the physician's geographical area. The reports of peer review committees are only advisory and not binding upon the carrier. The peer review process, however, provides the carrier with an accurate assessment of whether or not a physician's practice is consistent with medical practices prevailing in that physician's geographical area. If a physician's practice exceeds the norm, *and the physician cannot offer a satisfactory explanation for the deviation, the carrier may conclude that the services rendered were not "reasonable and necessary," and that the physician has over-utilized the Medicare program.*

We hold that the facts material to a cause of action for recoupment of overpayments on Beck's 1972 claims became known, or reasonably could have become known to the government shortly after September 15, 1976, when Blue Cross received the Foundation's report that Beck's practices far exceeded the norms of similar practitioners in Beck's geographical area.

*Id.* at 1558–59 (emphasis supplied emphasis added). The Court interprets *Beck* and its predecessors to hold that a physician's profile indicating that the frequency or nature

of his or her procedures deviates from the statistical norms does not, standing alone, put the government on reasonable notice of "facts making up the very essence of the right of action." It is only after some reasonably in-depth analysis of the physician's cases, through peer review or internal investigation of the patient's records, that the carrier, and in turn the government, can be charged with constructive knowledge of a right of action. Applying this principle to the case at bar, I find that the government was on notice of its claims no earlier than October 20, 1980.

Defendant downplays *Beck*, focussing instead on the suggestions in *Kass* and *Diaz* that the dates the carriers received peer review reports were merely the *outside* dates for charging them with knowledge of the overpayments. As already noted, *Diaz* was remanded to the district court to determine whether the government had constructive knowledge of the overpayments to the defendant before the carrier received the peer review report. In this case, Dr. Ruegsegger asserts, the carrier conducted an in-depth analysis of 10 of his patients to determine if unnecessary services had been rendered. This in-depth analysis occurred in 1979 before Blue Cross sought the opinion of the peer panel. For each patient, Ruegsegger notes, the carrier prepared a "Resume of Services" setting forth the name, address, and social security number of the patient, the method of payment, the diagnoses, the number of office visits, electrocardiograms, x-rays, diagnostic studies and other procedures performed, the date or dates of each visit and procedure, the names of other physicians treating the patient, and a cumulative total of all visits by the patient and the medical services performed from 1976 until the resumes were prepared in the Spring of 1979. The dates these resumes were prepared should function as the commencement date of the statute of limitations according to Dr. Ruegsegger. The Court disagrees.

While the "Resumes of Service" and the work that went into preparing them might at first glance appear to constitute the kind of in-depth review justifying an assumption of constructive knowledge on the carrier's part, closer scrutiny reveals that these summaries are nothing more than a distillation of the information derived from the Ruegsegger's computer profile as measured against the statistical norms. In both *Kass* and *Diaz* the carrier requested the physicians' records for detailed investigations *before* seeking the assistance of peer panels. What Ruegsegger characterizes as in-depth analyses here were based solely upon the generic information contained in the computer—general descriptions of diagnoses and nature and frequency of treatments. Emphasizing the critical distinction between actual medical records and the profiles used to flag statistical deviations, the Court in *Kass* observed:

> The additional records are requested because the utilization profiles are very general, indicating when a doctor has claimed a reimbursement for services which exceed, by some comparative measure, those generally claimed by the medical community. *Because there may be some valid reasons for a "high" claim, the records are necessary to explore the possible causes for the large figure.*

*Id.* at 1495 n. 2 (emphasis added). Here, the carrier did not request or obtain Ruegsegger's records and thus lacked any case specific information, as well as the doctor's own explanations, upon which to base an informed conclusion. Whatever extrapolation Blue Cross may have done from the computer data, it could not substitute for an analysis of the doctor's files and explanations, nor was it intended to as discussed in Part II below. In this regard, the Court is constrained to note defendant's characterization of the carrier's computer guided analyses in his response to the government's summary judgment motion on the issue of liability:

> The use of computer-generated statistical "norms" to measure medical necessity of a physician's part B services and procedures has a chilling effect on the advancement of medical knowledge and care of the aged and infirm. Unless a physician is willing to give medical treat-

ment within the parameters of some undisclosed computerized average of office visits, diagnostic tests, laboratory studies and physiotherapy treatments, he is at risk in receiving payments under Part B as regulated. The computerized "norms" foster a policy of mediocre medicine for those aged and infirm Medicare-assignment patients who have enrolled under Part B.

Defendant's Memorandum of Law at 29. Since Blue Cross opted not to conduct an internal investigation of Ruegsegger's records in the first instance, it did not have a reliable indication that overpayments had been made until it received the peer panel's fact-based report. Thus, this action is not time-barred.[6]

## II. Judicial Review of Blue Cross' Overpayment Determination.

In support of its motion for summary judgment, the government argues that defendant is not entitled to judicial review of the carrier's determination of the existence and amount of overpayments. *See United States v. Erika*, 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982) ("Congress by enacting the Medicare statute ... specifically precluded [judicial] review ... of adverse hearing officer determinations of the amount of Part B payments"). Defendant responds that he is not challenging the carrier's calculations in his particular case but rather is challenging the underlying method used to compute alleged overpayments. Specifically, Ruegsegger asserts, he is challenging "the methods employed in computer generating statistical 'norms' used to measure medical necessity of a physician's services under Part B" and is thus not bound by the carrier's non-judicial determination of overpayments. For

this proposition, Ruegsegger purports to find support in *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), where the Supreme Court held that Congress did not preclude judicial review of the method by which Part B overcharge determinations are made, as opposed to the determinations themselves. Ruegsegger's reliance on the holding in *Bowen*, while correctly stated, is of no use to him here.

■ In *Bowen*, a group of physicians filed suit in federal district court challenging a regulation that authorized the payment of Part B benefits in different amounts for similar medical services. The district court ruled that the regulation was inconsistent with the Medicare Act and that ruling was affirmed on appeal. The Supreme Court granted the government's petition for a writ of certiorari. Ignoring the merits of the action, the Secretary of Health and Human Services argued, as it did below, that Congress had expressly foreclosed judicial review of disputes over payments under Part B of the Medicare program. *See* 42 U.S.C. § 1395; *Erika, supra*. Holding that the Medicare Act prohibited only judicial challenges to overpayment calculations under Part B rather than challenges to "the *method* by which such amounts are to be determined," *Id.* at 667, 106 S.Ct. at 2134, the Court rejected the government's position. It is this distinction between attacks on calculations and attacks on the method of calculation that Ruegsegger seizes upon in support of his position. What he omits from or ignores in his papers, however, is the rationale underlying the distinction:

> '[T]he legality, constitutional or otherwise, of any provision of the Act or regu-

---

**6.** Ruegsegger asserts that if the Court adopts the date the carrier receives a peer review report as the triggering date for the commencement of the limitations period, "then the statute of limitations will never commence for those physicians whose practices are never submitted for review." Defendant's Reply Memorandum of Law at 11. He also raises the specter of a carrier delaying referral of a case "to peer review for as long as it wished forcing physicians to litigate claims well beyond the six year statute of limitations." *Id.* This concern is ad-

dressed adequately and succinctly by the government:

> The Court need not decide what triggers the statute of limitations when the carrier does not refer a physician's claims to peer review because in this case the carrier did refer the case to peer review. Nor need the Court consider what its ruling would be if peer review were unduly delayed, because Dr. Ruegsegger makes no claim that it was.

Plaintiff's Reply Memorandum of Law at 22 n.

lations relevant to the Medicare Program' *is not considered in a 'fair hearing' held by a carrier to resolve a grievance related to a determination of the amount of a Part B award.  As a result,* an attack on the validity of a regulation is not the kind of administrative action that we described in *Erika* as 'an amount determination' which decides 'the amount of the Medicare payment to be made on a particular claim' and with respect to which the Act impliedly denies judicial review.

*Id.* at 675–76, 106 S.Ct. at 2138–39 (emphasis added).  In conclusion, the Court reemphasized "that those matters which Congress did *not* leave to be determined in a 'fair hearing' conducted by the carrier—including challenges to the validity of the Secretary's instructions and regulations—are not impliedly insulated from judicial review by 42 U.S.C. § 1395ff (1982 ed. and Supp. II)."  *Id.* at 678, 106 S.Ct. at 2140 (emphasis supplied).  In other words, any issue within the jurisdiction of the hearing officer, including the proper approach to medical care which might be characterized as a "method," is not subject to judicial review.

That a disgruntled Medicare claimant cannot avoid the proscription of *Erika* by simply recasting a challenge to an overcharge determination as an attack on methodology was highlighted in *Kuritzky v. Blue Shield of Western New York, Inc.,* 850 F.2d 126 (2d Cir.1988).  In *Kuritzky,* several physicians complained to Blue Shield about the way in which their benefits were computed.  After a "fair hearing," the hearing officer ruled in favor of the carrier.  Thereafter, the physicians commenced an action in federal district court.  The district court dismissed the action and the Court of Appeals affirmed.  Rejecting the plaintiffs' characterization of the lawsuit as a challenge to Blue Shield's "'methods' in calculating benefits," the Court explained:

[T]he statement in *Michigan Academy* that challenges to the "method" of calculating benefits are reviewable as opposed to challenges to the "determinations themselves," which are not, *id.,* clearly refers to the distinction between the rules, regulations, and statutes setting forth the proper computation method and the carrier's application of those provisions in determining the benefits owed.  *Id.* [476 U.S.] at 675–76, 106 S.Ct. at 2138–39.  *"Methods" does not mean the carrier's method of applying the regulations,* which *Erika* held was unreviewable; rather, it means the method set forth in the Secretary's regulatory scheme that prescribes how the carriers are to calculate benefits.  *Michigan Academy* held that a challenge to this prescribed method was reviewable.  Plaintiffs' claims allege only misapplication of valid regulations and are therefore unreviewable under *Erika.*

*Id.* at 128 (emphasis added).

■ Thus, to fall within the *Michigan Academy* exception, defendant was obligated at this stage to submit some properly qualified evidence tending to establish that the computer norms used by Blue Cross controlled the carrier's method of calculating overpayments and further that those norms could not be challenged at a "fair hearing."  Defendant has failed to do this, and indeed has failed to demonstrate that the computer norms were even considered once his practice came under scrutiny.

Whether or not, as defendant asserts, "it is reasonable to assume" that the carrier's statistical norms "were implemented with the assistance [of] or after review by the Secretary,"[7] it is clear from the uncontradicted evidence submitted by the government that the norms functioned, in the first instance, only to flag particular claimants for further investigation.  At each subsequent stage of the investigation, the carrier, through the peer review committee and later the fair hearing officer, attempted to analyze the reasonableness and necessity of Ruegsegger's Medicare-insured procedures on a case by case basis, with consideration of Dr. Ruegsegger's explanations where offered.  As set forth above, the hearing officer repeatedly told Ruegsegger

---

**7.** The implication being that they are de facto        regulations.

448

that he would review his practices without regard to Blue Cross' statistical norms or the peer panel's conclusions. To the extent that the amount sought to be recovered here is based upon a deviation from Blue Cross' norms, it is because Ruegsegger voluntarily forfeited the opportunity to demonstrate before the hearing officer that all or part of the alleged overcharges corresponded to medically sound and necessary procedures. In this connection, the Court agrees with the government that, apart from the inapplicability of the *Michigan Academy* exception to this case, Ruegsegger's failure to pursue his administrative remedy before the fair hearing officer provides an additional basis for precluding his attack on the government's overcharge claim in this forum. *Cf. United States v. Savarese*, 515 F.Supp. 533, 536 (S.D.Fla. 1981).

At the end of his Reply Memorandum of Law, Defendant requests further discovery to obtain evidence in opposition to plaintiff's motion for summary judgment. That request is denied for two reasons. First, even if defendant could obtain evidence tending to establish that the computer generated norms would have had some bearing on the fair hearing, he waived his right to judicial review by declining to submit to such a hearing. *Id.* Second, Defendant's application for further discovery pursuant to Fed.R.Civ.P. 56(f) is inadequate. Rule 56(f) provides as follows:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

As interpreted in this circuit, the rule requires the opponent of the motion for summary judgment to explain:

1) the nature of the uncompleted discovery, i.e., what facts are sought and how they are to be obtained; and

2) how those facts are reasonably expected to create a genuine issue of material fact; and

3) what efforts the affiant has made to obtain those facts; and

4) why those efforts were unsuccessful.

*Burlington Coat Factory Warehouse v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir.1985). Defendant's assertion that he "has not had an opportunity to complete his pre-trial discovery on the issues raised by the pleadings" does not meet this burden, particularly at this late stage of the litigation.

Accordingly, defendant's motion for summary judgment is denied and plaintiff's motion for summary judgment is granted.

SO ORDERED.