UNITED STATES of America, Plaintiff,

v.

GOVERNMENT DEVELOPMENT BANK, Defendant.

Civ. No. 88–00531 (PG).

United States District Court, D. Puerto Rico.

Oct. 30, 1989.

As Amended Nunc Pro Tunc Nov. 21, 1989.

Russel B. Kinner, Civil Div., U.S. Dept. of Justice, Washington, D.C., and Lydia Pelegrin, Asst. U.S. Atty., Hato Rey, P.R., for plaintiff.

Pedro Juan Perez–Nieves, Santurce, P.R., for defendant.

## OPINION AND ORDER

PEREZ–GIMENEZ, Chief Judge.

This is a contract dispute between the United States (the Government) and defendant Government Development Bank (GDB) over the latter's alleged breach of its duties in connection with the administration of the Food Stamp Program in Puerto Rico. The Government seeks damages for defendant's failure to "use ordinary care and diligence in the redemption, verification and destruction of certain food stamps presented to it for those purposes," and, alternatively, for "money paid to defendant by mistake and without authorization," insofar as defendant's negligence permitted the theft, alteration, and subsequent multiple redemption of food stamps that were in its custody.

The matter is before the Court on defendant's April 3, 1989, motion for summary judgment, as well as its May 12, 1989, request for leave to file a third party complaint. Oppositions and replies were filed during the summer months and oral arguments were held on August 31, 1989. These motions are now ready for adjudication.

Three are the issues that occupy our attention today. Defendants motion for summary judgment tenders the first two. The argument is pressed upon us that Sec. 2415(a), 28 U.S.C., which prescribes a six-year limitations period for government contract actions, bars the March 4, 1988, filing of the instant complaint. The success of this contention is premised on a determination to the effect that the Government's claims had accrued no later than March 4, 1982. A second argument invites us to hold that the Government is estopped from proceeding on its claim against GDB. Lastly, and then on a procedural note, we must turn to consider defendant's motion for leave to file a third party complaint.

## I

Due performance of this circumscribed task requires us to begin with a little bit of history. In 1964 Congress enacted the "Food Stamp Act of 1964"[1] which had the laudable purpose of permitting low-income families to purchase nutritionally adequate diets through normal channels of trade. The United States Department of Agriculture (USDA), through the Food Nutrition Service (FNS), was the agency entrusted with the administration of the Food Stamp Program.

On July 1, 1974, the Federal Reserve Bank of New York (FRB–NY), acting as fiscal agent for the United States, contracted the services of defendant GDB for the administration of the Food Stamp Program in Puerto Rico and the Virgin Islands. The contract provided that GDB would perform its duties "in accordance with ... the manual entitled "Operating Instructions and Procedures," "use ordinary care and diligence in the performance of its duties," "[use] the method approved by" the FRB for destroying coupons, and "keep separate accounts and records of all its activities performed under the contract." The "duties" referred to above pertained to the redemption, verification, and destruction of food stamps. Throughout their contractual relation, FRB–NY exercised a high degree of control over measures and procedures and reimbursed GDB for all costs and expenses of operation.

In order to process the food stamp coupons in controversy, GDB created a Food Stamp Credit and Redemption Division located at the Naval Base at Isla Grande. The Division, in turn, was composed of three units, to wit, the Receiving Unit, the Processing Unit, and the Destruction Unit. The procedures that all units were required

1. The Act was later amended and is now referred to as "The Food Stamp Act of 1977, as amended," 7 U.S.C. Sec. 2011–2029.

to follow in accounting for food stamp coupon deposits were expressly set forth in the Manual of Procedures [2] and any funds transferred by the FRB–NY were reimbursed solely by the United States government.

A brief description of the Office of Inspector General (USDA–OIG) is necessary for a better understanding of the facts of this case. This office was created by the United States Congress and answers directly to Congress and to the Secretary of Agriculture. USDA–OIG Investigations had no less than three divisions in Washington D.C. and seven regional offices. Each USDA–OIG Investigations regional office could have various suboffices. Over the period during which the facts of this case took place, there was one such suboffice in San Juan, Puerto Rico. Up to October 19, 1981, the San Juan suboffice was administered by the USDA–OIG Investigations Northeast regional office. Thereafter, those duties were performed by the North Atlantic regional office. The USDA–OIG Investigations regional is headed by the Regional Inspector General (RIG), who may have one or more Assistant RIG's and a staff of criminal investigators and special agents.

Having set the stage, it is now time to introduce the parties'. In so doing, we resort extensively to the parties joint statement of undisputed material facts.

During the year 1978, USDA–OIG agents stationed in San Juan were making visits to GDB as part of their investigation into allegations of food stamp trafficking activities by local merchants. Accompanying these agents on one occasion was Mary O'Mara, an agent from OIG headquarters in Washington DC. These agents noticed breaches in security which were serious enough as to allow for food stamps to be stolen. Additionally, allegations that such steals were actually taking place were received by the agents.

Beginning in March, 1980, and after receiving confidential information that merchants were recirculating food coupons previously deposited and credited through GDB which had been stolen by employees prior to destruction, FBI and USDA–OIG special agents undertook an investigation of the suspects believed to be involved in the scheme. During the month of September, USDA–OIG special agents Héctor Quiñones and Emilio Rodriguez conducted undercover surveillance posted as security guards at the entrance to GDB's Isla Grande facility. GDB's employees under suspicion included Carlos Rosado and Edwin Aledo, the two clerk's in GDB's Destruction Unit. On September 12, 1980, these special agents allegedly witnessed the suspects stealing food stamp coupons from the Isla Grande facility and reported their observations to Supervisory Agent Robert Dohmen, who was the Special Agent in charge of the San Juan suboffice. GDB, although aware of the fact that the surveillance was taking place, was never fully informed of the details of the investigation. Later that month, however, agents Quiñones and Rodriguez had to be withdrawn from their posts as it became known that GDB employees had identified them as undercover agents. Attempts were made to pursue the investigation by other means and GDB was asked not to make extraordinary changes in its procedures so as not to disrupt the investigation.

In July, 1981, and with the authorization of GDB's President Julio Pietrantoni, the Bureau of Special Investigations of the Commonwealth of Puerto Rico placed an undercover agent within the Isla Grande facility. Between the months of July and September, 1981, however, that surveillance could not detect any illegal activity. The results of this undercover investigation were later reported to GDB, FRB–NY, and USDA–OIG. During this same period of time, supervisory agent Robert Dohmen met with Mr. Pietrantoni and informed him that the food stamp trafficking allegations had not been corroborated.

On September 3, 1981, the FBI closed an independent investigation that was being carried out into the allegations of food stamp trafficking by GDB employees.

2. See Joint Exhibits No. IV, X, XI, XII, and XIII.

Between the 15th and 20th of November, 1981, Michael Lonergan, the new North Atlantic RIG, was briefed on the allegations concerning theft of food stamp coupons by GDB employees, and during a visit to GDB's Isla Grande facility, noticed the above referred security breaches. The FRB–NY and FNS were notified of said investigation and report. Between November and December, 1981, USDA–OIG recommended to FNS that it conduct its own survey of security at GDB's Isla Grande facility.

Between January 11 and 13, 1982, Charles Hanson from FNS and David Slackman from FRB–NY met with GDB officials and conducted a survey of GDB's Isla Grande facility. That survey concluded, however, that established procedures and building structures offered adequate protection against theft by its employees, at least absent extensive collusion.

On February 26, 1982, USDA–OIG received confidential information that the food stamp stealing scheme was running anew, this time at a greater degree. Beginning on March 9, 1982, USDA–OIG agents once again conducted surveillance of GDB's Isla Grande facility. On March 12, 1982, USDA–OIG agents, along with Secret Service agents, arrested previously suspected Carlos Rosado and Edwin Aledo, along with two tickometrists from the Processing Unit named Pedro Figueroa and Frank Piñero. On that same day, special agents confiscated $12,818.00 in cash and a $25,000.00 certificate of deposit from a van owned by Rosado, $42,030.00 worth of food stamp coupons from Rosado's van and an automobile owned by Piñero, a loaded Smith & Wesson model 59, 9 millimeter, semi-automatic pistol from Rosado and an unloaded Smith & Wesson Model 39–2, 9 millimeter, semi-automatic pistol from Figueroa. On March 17, 1982, $5,500.00 worth of food stamp coupons were found above the acoustic, drop-ceiling tiles in the second-floor bathroom of GDB's Isla Grande facility. None of these coupons were marked "VOID" in indelible ink.

In the months that followed, the suspects were convicted of multiple crimes against the laws of the United States. On June 30, 1982, for reasons unrelated to the facts of this case, Congress discontinued the Food Stamp Program in Puerto Rico. After September 10, 1982, no food coupon issued in Puerto Rico was permitted to be redeemed by any bank.

## II

■ The parties, agreeing on little else, concede that the applicable statute of limitations is the one provided by 28 U.S.C. § 2415(a). Enacted in 1966, prior to which there were no limitations periods for the majority of government actions, it was designed "to promote diligence by the government in bringing claims to trial and also to make the position of the government more nearly equal to that of a private litigant." *United States v. Kass*, 740 F.2d 1493, 1496 (11th Cir.1984). *United States v. Cardinal*, 452 F.Supp. 542 (D.Vt.1978). In essence, the statute provides that contract actions brought by the United States shall be barred unless the complaint is filed within six years after the cause of action accrued or one year after the final administrative decision has been rendered, whichever is later. Only the first of these two limitations concerns us in this case.

Not surprisingly, much of the § 2415(a) case law circles around the question of when the government's "cause of action accrued." This determination is further compounded by § 2416(c), which provides that for "the purpose of computing the limitations periods established in § 2415(a), there shall be excluded all periods during which … facts material to the right of action are not known and reasonably could not have been known by an official of the United States charged with the responsibility to act in the circumstances." Therefore, although the general rule in contract actions is that the cause of action accrues at the time of the breach, *United States v. Kass*, 740 F.2d 1493, 1497 (11th Cir.1984), it must also be determined that an official with some degree of prosecutorial power was aware or should have reasonably been aware of the requisite material facts regarding the government's cause of action

at that time. See also *Jankowitz v. United States*, 533 F.2d 538, 547–548, 209 Ct.Cl. 489 (Ct.Cl.1976).

Since a full understanding of § 2416(c) is tantamount for the resolution of this case, we turn to the statute's legislative history. In enacting § 2416(c), Congress recognized that this provision was necessary "because of the difficulties of Government operations due to the size and complexity of the Government." 1966 U.S.Code Cong. & Adm.News, p. 2507–2508. As reflected in the legislative history, however, the "official of the United States with the responsibility to act in the circumstances" need not be "at the highest level of the Government." Congress expressed that responsibility in such matters could extend down into lower managerial levels within an agency. Between these two ends of the spectrum, the managerial official whose knowledge of the facts of a case could trigger the running of § 2415(b) against the Government would be the one who is likely to know that the material facts involve the possibility of a cause of action which may be asserted by the Government. Once the facts making up "the very essence of the right of action" are known or are reasonably knowable to these officials, the limitations period begins to run. *United States v. Kass*, 740 F.2d 1493, 1497 (11th Cir.1984).

Our inquiry is thus a limited one. We must determine the time during the ongoing criminal investigation at which material facts making up the very essence of the government's cause of action were reasonably knowable to federal officials charged with the responsibility to act in the circumstances. In this respect, plaintiff contends that its right of action accrued on March 12, 1982, the day that the suspects were arrested, since it was on that date that material facts giving rise to its cause of action became known to officials charged with the responsibility to act in the circumstances. Alternatively, it argues that its cause of action accrued on September 10, 1982, the last day on which a bank could receive credit for a food stamp coupon redeemed in Puerto Rico, since it was not until that date that the Government could present a final accounting of its financial loss. Defendant, on the other hand, is of the opinion that the accrual date goes all the way back to September, 1980, at which time USDA–OIG agents observed GDB employees withdrawing food stamp coupons from the Isla Grande facility. At that point, the argument goes, the Government had sufficient knowledge of the requisite material facts to trigger the running of the statute of limitations.

We need not address plaintiff's "final accounting" argument, for we find its alternative position to be persuasive. Under the circumstances of this case, the date of the arrests seems to us to be the earliest possible date at which it would be reasonable to expect that the corresponding government agency know all the requisite material facts making up the very essence of its cause of action. Consequently, it is the earliest possible date at which it would be reasonable to expect that the Government exercise its rights in the courts. Our conclusion is based on several premises which we now pause briefly to explain.

First, it should be clear that the Government officials "charged with the responsibility to act in the circumstances" were those at FNS or FRB–NY and not the USDA–OIG criminal investigators. While Congress expressed that the officials that were to be held responsible need not be at the highest level of the Government, it only went as far as to say that this responsibility could extend into lower *managerial* levels within the agency. As plaintiff correctly points out, it was FNS and FRB–NY that were entrusted with the administration of the Food Stamp program in Puerto Rico. The Office of Inspector General (USDA–OIG) was only the investigatory arm of the USDA. Its criminal investigators receive training in criminal, not civil, law and were not familiar with the contractual relations that existed between the parties to this suit. The undisputed facts fail to reveal that any information that might have supported a government cause of action ever went higher than the USDA Office of the Inspector General. Specifically, the USDA–OIG special agents' alleged

1980 observation of GDB employees stealing food stamp coupons from the Isla Grande facility, on which defendant relies so heavily for its contention, was only reported to special agent Robert Dohmen, who was the supervisory agent in charge of the San Juan suboffice. Nothing in the parties' statement of undisputed facts, and no evidence adduced at the oral arguments, suggests that officials at FNS or FRB–NY were ever informed of the details of the investigation.

Determining which federal officials were to be held accountable, however, will not resolve this case. Defendant's main contention is to the effect that had the Government diligently pursued its investigation and followed through on the information it had beginning in 1978, the suspects could have been arrested much earlier than March, 1982. Assuming, for the sake of argument, that the criminal investigators were the officials "charged with the responsibility to act in the circumstances," defendant's argument suggests that the actual arrests of the suspects are irrelevant for accrual purposes, and that the important fact is whether the agents had sufficient evidence to effectuate these arrests. With this we would agree. However, the argument, which by the way concedes that prior to the arrests the agents in fact did not have sufficient evidence to trigger § 2416, in effect invites us to conclude that had the agents been diligent in carrying on their investigation they would have gathered the evidence making up the requisite material facts at an earlier time. Thus, defendant would have us evaluate the investigators' work, conclude that it was inefficient, and hold that their inefficiency triggered the running of § 2415(a).

In so stating, defendant misconstrues the role of the courts in our judicial system. It is not for judges to direct criminal investigations from their trial bench. USDA–OIG special agents are trained in undercover surveillance and detective work. Whatever the intricacies of their criminal investigation, these agents did not deemed it appropriate to arrest the suspects based on the information they had before 1982. We assume that their investigation was carried out in adequate fashion, although whether it was or not is irrelevant for accrual purposes, and note that a more important fact is that there was no conceivable interest that could have been furthered from their point of view by postponing the arrests to a later date. Clearly, intentionally delaying the running of the statute of limitations was not in their minds. If these agents did not have sufficient information to effectuate the arrests before March 10, 1982, the Government certainly did not have sufficient material facts to substantiate a cause of action at the time. For purposes of establishing the "knowledge" requirement, the one depended upon the other.

Even if we were to accept defendant's contention as a matter of law, an overview of the undisputed facts reveals that their conclusion is not supported by the record as a matter of fact. Prior to the arrests of March 10, 1982, at least four separate investigations into the food stamp trafficking allegations had come up empty handed. During the months of July and September, 1981, the Bureau of Special Investigations of the Commonwealth of Puerto Rico conducted an investigation within GDB's Isla Grande facility. The negative results were reported to GDB, FRB–NY, and USDA–OIG. During those same months, supervisory agent Robert Dohmen informed GDB's President Mr. Julio Pietrantoni that the USDA–OIG had not been able to corroborate the food stamp trafficking allegations. On September 3, 1981, the record shows that an independent investigation that was being carried out by the FBI was closed without any positive results. In January, 1982, FRB–NY and GDB conducted a joint survey of the Isla Grande facility only to conclude that the facility was adequately protected.

Thus, even though the agency had been receiving confidential information on the food stamp trafficking scheme since 1978, it had also been receiving feedback to the effect that those allegations could not be corroborated. It was therefore not until the arrests were made on March 10, 1982, that FNS and FRB–NY first received concrete corroboration of the allegations into

the food stamp trafficking scheme. Even though it is true, as defendant points out, that no court has worded its § 2416 opinions so as to require that the government must obtain "independent evidence that would corroborate the facts material to the right of action," it should not be disputed that uncorroborated allegations do not make up "the very essence of a right of action." The material facts need not be "independently" corroborated, but they cannot rest on mere suspicions and allegations.

Although we believe the foregoing arguments suffice to support our holding today, we go the extra mile. Defendant cites several § 2415 cases to defend its position in the instant case. None of those cases, we suggest, is applicable to the one at bar. Reliance on *United States v. Skidmore*, 505 F.Supp. 1101 (S.D.N.Y.1981) and *United States v. Cardinal*, 452 F.Supp. 542 (D.Vt.1978) (holding that a cause of action accrues when a claim first could have been sued upon,[3] which in contract actions is at the time of the breach) is misplaced for a simple reason. The district courts in those cases, although applying § 2415 for limitations purposes, did not have to consider the effect that the tolling provision of § 2416 had on the facts of the cases. Hence, the decisions were rendered on other grounds. As noted above the resolution of this case turned on the interpretation and application of § 2416(c). In our view, these cases are thus inapposite to the case at bar.

Perhaps closest in point was the Court of Claims decision in *Jankowitz v. United States*, 533 F.2d 538, 209 Ct.Cl. 489 (1976). Paradoxically, however, we believe this case also cuts against defendant's position. In an action brought by a former Federal Housing Administration appraiser seeking pay he would have earned had he not been the object of an adverse personnel decision, the Government counterclaimed to recover a number of illegal payments made to plaintiff. In applying §§ 2415(a) and 2416(c) to the Government's cause of action, the Court characterize the Government's claim as one deriving from a contract implied in law. Therefore, although the cause of action accrued at the time of the illegal payments, the limitations period was tolled until responsible officials charged with the investigation of possible illegal payments had available facts pertinent to the investigation. As is readily apparent, this is precisely the analysis we have applied to decide the limitations issue in this case. Particularly hostile to defendant's position, however, was the fact that the Court found that this condition was not met until the United States Attorney for the Eastern District of New York received allegations indicating the presence of a scheme by a mortgage company calculated to defraud the United States through false information on FHA mortgage insurance applications. Surely, other government officials had stumbled over these fraudulent applications before the District Attorney had the opportunity to examine them, but it was this high level employee's knowledge which was deemed adequate to meet the standards of § 2416(c).

Finally, the cases of *United States v. Kass*, 740 F.2d 1493 (11th Cir.1984) and *United States v. Beck*, 758 F.2d 1553 (11th Cir.1985) were also brought to our attention. These cases derive from a long line of cases decided under the very particular regulations applied under the Medicare program. As the First Circuit's decision in *United States v. Hughes House Nursing Home, Inc.*, 710 F.2d 891 (1st Cir.1983) illustrates, the contractual relation that exists between the government, the fiscal intermediary, and the provider of services under the Medicare program is very different than the one that existed between the Government and GDB. Aside from the Medicare program's complex auditing procedures described in the *Hughes House*

---

**3.** Viewed from this standpoint, defendant's position also stands on shaky grounds. It is difficult to see how the United States could have sued GDB for damages prior to 1982, resting on mere allegations that could not be corroborated for several years. If the Government could not yet bring an action against defendant at that time, its cause of action clearly had not accrued and the limitations period had not begun to run. Cf. *Richards v. Mileski*, 662 F.2d 65, 71–72 (D.C.Cir.1981).

opinion, not present in the food stamp program, it is the policy of the Medicare program's administrators to place the estimated costs immediately in the hands of the providers in order to guarantee a steady flow of income sufficient to provide service, even though so doing leads to overpayments during the year. *Hughes House,* at p. 893. Such a procedure makes it impossible to determine exactly what amount of money, if any, is owed to the government until the final audit, and no "breach" of the contractual obligations can be ascertained until that time. It should be clear by now that this case did not hinge on a determination of the time of the breach but on a determination of the time at which the government officials had knowledge of the pertinent material facts regarding the United States cause of action.

We bring this part of our opinion to a close. Federal officials charged with the responsibility to act in the circumstances did not have knowledge of the requisite material facts making up the very essence of its right of action until the arrests in controversy were made. Up to that point the Government had been moving in a sea of mere suspicions and allegations. These arrests took place on March 10, 1982. Thus, we hold that the March 4, 1988, filing of the instant complaint was timely. The Government may proceed with its case.

### III

A second argument advanced by defendants in its motion for summary judgment, once entertained, need not occupy us for long. It is contended that the United States, acting in its proprietary capacity and through its failure to keep defendants informed of the results of its investigation, led GDB into a false sense of relative security which prevented it from taking additional measures to reduce the possibility of theft. Thus, we are told, the Government should now be estopped from bringing a claim based on the alleged failure of GDB to adopt such measures.

Equitable estoppel is a doctrine invoked to avoid injustice in particular cases. *Heckler v. Community Health Services,*

467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1983). The United States Court of Appeals for the First Circuit has defined equitable estoppel as a judicially devised doctrine which precludes a party to a lawsuit, because of some improper conduct on that party's part, from asserting a claim or a defense, regardless of its substantive validity. *Phelps v. Federal Emergency Management Agency,* 785 F.2d 13, 16 (1st Cir.1986). It has further stated that courts invoke the doctrine when one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it acts to his or her detriment. *Federal Deposit Insurance Company v. Roldán Fonseca,* 795 F.2d 1102, 1108 (1st Cir.1986).

The traditional elements of the doctrine are thus three: first, a material misrepresentation of a party who had reason to know of its falsity; second, reasonable reliance upon the misrepresentation; and finally, some disadvantage to the party seeking to assert estoppel fairly traceable to the misrepresentation. *Falcone v. Pierce,* 864 F.2d 226, 228 (1st Cir.1988). Probing deeper into the reliance element, we note that it must be "in such a manner as to change his position for the worse, . . ., and reasonable in that the party claiming the estoppel did not know nor should it have known that it's adversary's conduct was misleading." *Heckler,* 467 U.S., at p. 59, 104 S.Ct. at p. 2223.

As applied to the government, however, the doctrine acquires a different dimension. "When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Heckler,* 467 U.S., at p. 60, 104 S.Ct. at p. 2224. For this reason, it is well established that a party is normally precluded from asserting the misrepresentation of a federal official as the basis of a contract claim. *Falcone v. Pierce,* 864 F.2d, at p. 228, and see generally, *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Two strong policy considera-

tions support the government's nonestoppel doctrine. First and foremost is the protection of the constitutional principle of the separation of powers, as a liberal application of equitable estoppel against the government would in fact allow courts to expand the powers of federal officials beyond legislative limits. *Phelps*, 785 F.2d, at p. 17. No less important a concern is the policy interest advocating for the protection of the public fisc. Unitarily, it has been said that the doctrine responds to "the need to protect the government against unscrupulous officials who may seek to profit through their fraudulent acts, possibly in collusion with private parties." *Falcone*, 864 F.2d, at p. 229.

The non-estoppel doctrine, however, is not so cardinal a principle as to allow for no exception. In *Heckler*, as it considered the Government's petition to adopt a general rule disallowing estoppel against the sovereign, the Supreme Court paused to observe:

> We have left the issue open in the past, and do so again today. Though the arguments the Government advances for the rule are substantial, we are hesitant, when it is unnecessary to decide this case, to say that there are no cases in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by

the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government.

*Heckler*, 467 U.S., at p. 60–61, 104 S.Ct. at p. 2224. See also *Falcone v. Pierce*, 864 F.2d, at p. 230. (adopting a similar approach when confronted with similar inquiry for pure rescission cases). Therefore, although the door has been left open, albeit slightly, no exceptions have been recognized to date [4]. Perhaps this fact, along with the fact that the Court has also decline to decide what type of "affirmative misconduct" [5] from a government employee will estop the Government from enforcing the law, *Schweiker v. Hansen*, 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1980), has led our First Circuit to remark that the Supreme Court "has consistently refused to apply the equitable estoppel doctrine against the government, no matter how compelling the circumstances." *Phelps*, 785 F.2d, at p. 17, and *Roldán Fonseca*, 795 F.2d, at p. 1108. Thus, it is our Circuit's position that the defense of equitable estoppel cannot be raised against the Government.

■ The case at bar is no exception. The First Circuit's admonition was clear enough. Equitable estoppel cannot be raised as a defense against the government, at least as far as litigation in this

---

**4.** Some of our sister circuits have found exceptions on several grounds, none of which have been found acceptable by our First Circuit. In *FDIC v. Harrison*, 735 F.2d 408 (11th Cir.1984) and *Meister Bros., Inc. v. Macy*, 674 F.2d 1174 (7th Cir.1982) the circuit courts distinguish between actions taken by the Government pursuant to its sovereign powers and those taken in its proprietary capacity. The First Circuit, noting that the Supreme Court "has found no merit in this distinction," *Phelps*, 785 F.2d, at 17, has effectively rejected that view. In *Pence v. Brown*, 627 F.2d 872 (8th Cir.1980), a distinction was made between contract cases for reformation (or specific performance) and cases of recision, and allowed estoppel against the government in the latter case. In *Falcone*, the First Circuit declined the invitation to make such a distinction because the case could be decided on other grounds (appellant did not meet the "reasonable reliance" requirement). Similarly, in *Heckler v. Community*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1983), fn. 12, the Supreme Court distinguished, among others, the cases of

*Moser v. United States*, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951) and *United States v. Pennsylvania Chemical Corp.*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1972), which had been signaled by critics to be exceptions to the general rule, see 4 K. Davis, Administrative Law Treatise § 20:2 (1983), as having been decided on grounds other than equitable estoppel. Finally, in *Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1980), fn. 4, the Court distinguished several cases on the grounds that in some of them the Government had entered into written contracts that supported the claim of estoppel and others were not threatening to the public fisc.

**5.** In *Immigration and Naturalization Service v. Hibi*, 414 U.S. 5, 8–9, 94 S.Ct. 19, 21–22, 38 L.Ed.2d 7 (1973), the Court suggested, in dictum, that the only situation in which it would permit estoppel against the Government was in cases where government agents had engaged in affirmative misconduct.

Circuit is concerned. But even had the First Circuit not advised us in so clear terms in favor of the government's non-estoppel doctrine, and assuming, *in arguendo*, that defendants could meet the "disadvantage" requirement of the doctrine of equitable estoppel, the facts of this case fail to pass muster on the other two. In the interest of completeness, we proceed to briefly discuss these points.

Defendant's basic contention is that since the Government did not inform GDB that the investigation was revealing serious breaches in security and the actual occurrence of thefts at the Isla Grande facility, GDB could not take any additional measures to prevent such thefts and the Government should not be allowed to bring suit against them for failing to take such measures. Though appealing at first impression, we must unveil a basic fallacy in defendant's argument. GDB's argument presupposes that its obligation to provide adequate protection at its Isla Grande facility derived from the results of the ongoing criminal investigation that was being conducted in its premises. However, this is not the case. Its obligation emanated from the original contract signed between FRB–NY and itself for the administration of the food stamp program. It was therefore independent, continuous, and preexistent, and it cannot be alleged that it was contingent on that security breaches be detected at its facility or that the Government inform the findings of its investigation. Consequently, defendant could not have "relied" on plaintiff's "conduct" in any way. We must therefore conclude that defendant would not be able to demonstrate reasonable reliance as a matter of law.

As for the "affirmative conduct" requirement, it suffices to note that although the First Circuit, like the Supreme Court, has not yet precisely defined its contours, it has made one point perfectly clear: official silence or inaction cannot constitute "affirmative misconduct." *Precious Metals Assoc. v. Commodity Futures*, 620 F.2d 900 (1st Cir.1980). Plaintiff's conduct, at best, amounts to just that. We must therefore further conclude that the "affirmative misconduct" element could not be met.

In view of the foregoing, we hold that there is no basis for invoking the doctrine of equitable estoppel.

### IV

■ On May 12, 1989, defendant filed a motion before this Court requesting leave to file a third party complaint. The purported third party defendant is the Federal Reserve Bank of New York (FRB–NY), whose connection with the facts of this case should be readily apparent from a quick overview of the facts of this case as presented above. This fact notwithstanding, on May 24, 1989, plaintiff filed its timely opposition to defendant's request. On June 1, 1989, defendant filed a reply thereto.

We begin with bedrock: the disposition of a motion for leave to file a third party complaint is committed to the sound discretion of the Court. *Rosario v. Amalgamated Ladies' Garments Cutters Union*, 605 F.2d 1228, 1247 (2nd Cir.1979), *Kopan v. GWU*, 67 F.R.D. 36, 37–38 (1975). Among the factors to be considered by the Court in exercising its discretion are possible prejudice to the plaintiff, complication of issues in the trial, likelihood of causing delay, timeliness of the motion to implead, the merit or substance of the third party complaint, and additional expenses to the parties. *Pérez Cruz v. Fernández Martinez*, 551 F.Supp. 794 (D.P.R.1982).

Plaintiff's objects to the inclusion of FRB–NY as a third party defendant on three grounds. First, it is contended that GDB has presented no justification for its delay in filing its request. Second, the Government argues that defendant has not made a *prima facie* showing of the merits of its claim. Third, plaintiff prays the request be denied for granting it would further delay the disposition of this case or prejudice FRB–NY's ability to prepare for trial. There is no merit to be found in any one of plaintiff's objections.

The issue of timeliness cannot be isolatedly considered but must be evaluated in connection with other circumstances, prominent among which is the effect that permitting impleading will have on the other parties. Wright & Miller, *Federal Practice and Procedure* Vol. 6, § 1454. When,

as in this case, the granting of such leave will not result in undue prejudice to the plaintiff, courts have allowed impleading even months after the filing of the original complaint. *Afif v. RMI Co.*, 93 F.R.D. 429 (E.D.Pa.1982) (17 months), *U.S. New Castle County*, 111 F.R.D. 628 (D.C.Del.1986) (three years). In the instant case, where the third party defendant, acting as fiscal agent for the plaintiff, was the one who actually initiated the contractual relationship between the parties, its inclusion in this suit would hardly cause any prejudice to any of the parties. FRB–NY has been fully aware of the proceedings to this point, has participated in producing documents, and has even been present, through its attorneys, at several depositions that have been taken during this litigation. Its participation up to this point has been almost necessary for a full understanding of the issues presented.

Plaintiff's second and third objections, namely, that defendant's have not presented a *prima facie* case on their own behalf and that granting its motion would further delay the disposition of this case, are equally meritless. GDB has alleged that the third party defendant is liable to the United States for all or part of plaintiff's claim against GDB because it exercised a high degree of control over its procedures and has specifically alleged that such control extended to personnel selection, salary raises, and job descriptions. We believe these allegations are sufficient to state a cause of action upon which relief may be granted. As for the extra delay in the disposition of plaintiff's claim, we believe any such inconveniences are outweighed by the advantage to be gained from full disposition of the controversies in a single action.

WHEREFORE, defendant's motion for summary judgment is hereby DENIED as to its statute of limitations and estoppel defenses, and defendant's motion for leave to file a third party complaint is hereby GRANTED.

IT IS SO ORDERED.