UNITED STATES of America, Plaintiff,

v.

Edgar M. STELLA PEREZ, Defendant.

Civil No. 85–2197 (RLA).

United States District Court,
D. Puerto Rico.

Jan. 29, 1997.

---

Assistant U.S. Atty. José M. Pizarro–Zayas, U.S. Attorney's Office, Civil Division, Hato Rey, PR, Michael Hertz, Stephen D. Altman, T. Reed Stephens, U.S. Department of Justice, Civil Division, for plaintiff.

Jaime E. Toro Monserrate, Pedro E. Ruiz–Meléndez, McConnell Valdes, San Juan, PR, Robert M. Simels, New York City, for defendant.

### ORDER DISMISSING REMAINING CLAIMS AS UNTIMELY

ACOSTA, District Judge.

### I. PROCEDURAL BACKGROUND

This action was originally instituted against EDGAR M. STELLA PEREZ and GUILLERMO A. ALEMAÑY RIVERA seeking relief under the False Claims Act as well as unjust enrichment and payment by mistake theories. Count I, asserted under the False Claims Act, was dismissed as un-

timely. *See U.S. v. Alemany Rivera,* 55 F.3d 703 (1st Cir.1995).

Thereafter, the parties were instructed to submit memoranda addressing the following issues,[1] which we have presently before us for disposition:

1. The applicable statute of limitations to COUNT II (unjust enrichment) and COUNT III (payment under mistake of fact);

2. The accrual date of these two claims including the applicable law and evidentiary support for each;

3. Show cause why the unjust enrichment claim should not be dismissed in view of the fact that plaintiff had available a statutory relief under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* but failed to pursue it in a timely fashion.

Given our findings in this Order, only the first two subjects will be addressed.

### II. THE REMAINING CLAIMS

According to the complaint, EDGAR M. STELLA PEREZ devised a scheme to divert for his own personal gain mortgage loan proceeds intended for medical equipment earmarked for the Hospital Nuestra Señora de Guadalupe. These monies were insured by the UNITED STATES through the U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT ("HUD").

The procedure utilized by defendant STELLA consisted of (1) over-pricing the equipment through invoices from CASA CARDONA and/or its subsidiary AAA HOSPITAL EQUIPMENT, INC. ("AAA") and (2) certifying the purchase of equipment that was never received at the hospital.

From 1975 through 1977 the funds intended for new equipment were disbursed through advances of mortgage proceeds by means of an "Application for Insurance of Advance of Mortgage Proceeds" (HUD Form 2403). Upon completion of the hospital construction in 1977, the remaining loan proceeds destined for new equipment were placed in an escrow account. Defendant

---

1. *See* Order Continuing Trial ... and Setting Briefing Schedule.... filed on January 2, 1996 (docket No. 108).

STELLA submitted four separate requests for disbursement of portions of the leftover funds between **June 1977** and **January 1978.**

**COUNT II** of the complaint seeks payment of **$686,000.00** under the doctrine of unjust enrichment, whereas **COUNT III** requests the same amount based on the theory of money paid under mistake of fact.

## III. *APPLICABLE STATUTE OF LIMITATIONS*

■ The nature of the claims asserted will determine whether they are subject to the three-year limitations period applicable to torts under 28 U.S.C. § 2415(b)[2] or the six-year term applicable to contracts and contracts implied in law or fact pursuant to 28 U.S.C. § 2415(a).[3]

Plaintiff argues that the remaining claims are "quasi-contractual" causes of action whereas defendant contends that "this action stems from fraud and as such it is a tort". Defendant's Memorandum of Law ... (docket No. 116) at 49.

The doctrine of quasi-contracts or contract implied in law evolved in the common law system as a practical measure to deal with situations which did not fit into either a contractual or tort scenario but justice demanded that some type of relief be afforded. These cases usually dealt with some type of unjust enrichment to a party and the courts utilized the fiction of a promissory relationship to impose an obligation to pay. In order to address unfairness, the courts developed the concept of a contract implied in law based on a fiction of a promise known in its origins as *assumpsit. See* Howard O. Hunter, Modern Law of Contracts ¶ 16.01 (1993) and Restatement of the Law of Restitution at 5–10 (1937).

The legal duties that were enforced by the use of this fictitious promise have come to be described as quasi contractual. In

other words, a promise "implied in law" is a *constructive* promise, a term that denotes a set of facts that will be treated *as if* a promise had been made.

Arthur Linton Corbin, Corbin on Contracts § 1.18(a) at 52 (footnote omitted) (1993).

Quasi-contracts are defined in 1 Restatement (Second) of Contracts § 4 at 15 (1981) as follows:

b. *Quasi-contracts.* Implied contracts are different from quasi-contracts, although in some cases the line between the two is indistinct.... Quasi-contracts have often been called implied contracts or contracts implied in law; but, unlike true contracts, quasi-contracts are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. They are obligations created by law for reasons of justice. Such obligations were ordinarily enforced at common law in the same form of action (assumpsit) that was appropriate to true contracts, and some confusion with reference to the nature of quasi-contracts has been caused thereby.

*Comment b.* As opposed to the inferred from fact ("implied in fact") contract, the "implied in law" quasi contract is no contract at all, but a form of the remedy of restitution.

■ In contract situations the parties' rights will be determined by law and by the terms of the contract whereas in quasi-contracts the court will be persuaded by principles of equity and justice. Contrary to contract law, the intention of the parties is immaterial in quasi-contracts litigation. *See* 1 Samuel Williston, A Treatise on the Law of Contracts § 1:6 (1990) and 1 Restatement (Second) of Contracts § 4 at 15.

A quasi-contractual obligation is one that is created by the law for reasons of justice, without any expression of assent and

---

**2.** 28 U.S.C. § 2415(b) reads:

Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States ... which is founded upon a tort shall be barred unless the complaint is filed within three years after the right of action first accrues....

**3.** In pertinent part, 28 U.S.C. § 2415(a) reads:

Subject to the provisions of section 2416 of this title ... every action for damages brought by the United States ... which is founded upon any contract ... implied in law ... shall be barred unless the complaint is filed within six years after the right of action accrues....

sometimes even against a clear expression of dissent.... Contracts are formed by expressions of assent. Quasi contracts quite otherwise.

Corbin on Contracts at 64.

Quasi-contracts may constitute either a source of a right or may simply provide a vehicle for a remedy in pre-existing contractual relationships. *See* Corbin on Contracts at 65. Remedies for quasi-contracts have been grouped in a body of law generally referred to as "restitution" with justice as the underlying basis for relief.

> Despite the fact that quasi contracts are imposed by law, they are not torts, except in the situations in which the victim of a tort may elect to treat the situation as if there were a contract. Despite the presence of unjust enrichment in most of these cases, unjust enrichment is not an essential prerequisite to quasi contractual relief; unjust deprivation or impoverishment of the claimant is often the gravamen of the cause of action.

Corbin on Contracts at 70 (footnote omitted).

> The interplay between restitution and contract law can be complex and uncertain. The greatest difficulty arises in distinguishing restitution as a body of law distinct from contract and tort on the one hand and restitution as a description of a group of remedies available in contract actions on the other hand. The intent of restitution is to do justice through an equitable approach to remedies for persons who have conferred benefits on others. Restitution covers a wide range of relationships, many of which involve fraud, duress, or other wrongdoing.

Hunter, Modern Law of Contracts § 16.01[1] at 16–1 to 16–2 (footnote omitted).

It is evident from the discussion above that the two remaining causes of action in these proceedings fall within the restitution/quasi-contract realm. The unjust enrichment and payment by mistake claims, as characterized in the pleadings, arise not from a particular contractual provision nor from an alleged tortious act or omission but from an equitable obligation imposed by law to correct a condition of alleged unfairness. Plaintiff charges that defendant STELLA personally benefited by the unauthorized diversion of funds destined for hospital equipment to the detriment of HUD. A remedy in equity is sought to rectify the situation; this is precisely the essence of a contract implied in law.

Accordingly, we reject defendant's argument that the claims for unjust enrichment/restitution and for payment under mistake of fact/restitution as alleged in the complaint sound in tort and are, consequently, subject to the shorter limitations period set forth in 28 U.S.C. § 2415(b). Rather, we find that the six-year limitations period found in 28 U.S.C. § 2415(a) applies to the outstanding causes of action which we find are founded upon obligations implied in law or quasi-contracts.

## IV. *TOLLING*

In order to be able to determine whether or not the outstanding claims are timely our next step is to ascertain when this period started to run, i.e., when the claims accrued for purposes of the statute of limitations and whether or not this period was extended.

The complaint describes **two** types of fraudulent conduct. First, it alleges STELLA caused HUD to authorize disbursements for equipment which was never delivered to the hospital.[4] Additionally, plaintiff charges STELLA with causing fraudulent overpric-

---

4. In pertinent part, the complaint describes the overpricing and missing equipment schemes as follows:

> . . . . .
>
> 13. [A] sizeable percentage of the funds advanced to AAA and Casa Cardona for equipment purchases were diverted for the benefit of Stella.... As a result of these activities, AAA and Casa Cardona were not able to purchase all the equipment for which they had already invoiced the hospital and such **equipment** was,

in fact, **never received by the hospital**. In addition, the **price** of equipment actually ordered by Cardona included an **average markup of approximately 34%**.

> 14. ... Stella attached **invoices for equipment that was not in fact at the hospital** and for equipment already purchased from other suppliers at a **lower cost than that indicated on the invoice**.

(emphasis ours).

ing of equipment intended for the Hospital which was paid for with mortgage proceeds through related companies, i.e., AAA and CASA CARDONA. No detailed factual breakdown has been provided in the complaint to distinguish between these two types of schemes and the exact same amount is requested as damages for both.

Although the means of executing these two fraudulent designs arise from a common source, i.e., false invoicing by two shell corporations, the government's opportunity to recognize crucial facts underlying each stratagem is not necessarily the same.

Discovering that equipment paid for with mortgage funds was not delivered to the hospital requires verification of tangible equipment, that is to say, something which is more readily apparent. On the other hand, the decisive factor in determining the tolling issue with respect to the overpricing allegation is focused on when the government became aware or should have become aware of STELLA's connection with the two related corporations. This would have, in turn, given rise to suspicions of a price scam.

The prescriptive term is extended during those periods of time when the UNITED STATES is not aware of material facts underlying the claims set forth in the complaint. Specifically, 28 U.S.C. § 2416 provides:

> For the purpose of computing the limitations periods established in section 2415, there shall be excluded all periods during which—
>
> . . . . .
>
> (c) facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances. . . .

According to the complaint, STELLA caused funds to be disbursed through advances of mortgage proceeds from **1975 to 1977** and thereafter defendant submitted four separate requests for disbursement of portions of funds held in escrow between **June 1977 and January 1978.** Thus, the statute of limitations has different onset dates since it began to run when each of the improper disbursements was made, i.e., from **1975 through January 1978.** The complaint was filed on **October 25, 1985** which renders the actions asserted herein time-barred unless the six-year statutory period was extended by virtue of its tolling provisions. However, no information has been provided in the complaint or the documents filed in this action to identify either the missing equipment or the date(s) when the allegedly erroneous payments were made to enable the court to determine the distinct accrual dates and tolling intervals.

The statute requires that two factors be present in order for the term to be enlarged: (1) knowledge of facts material to the claim (2) by "an official of the United States charged with the responsibility to act in the circumstances."

■ The "material" facts alluded to in the statute are those essential to a cause of action, that is, those which give rise to the claim. *Phillips Petroleum v. Lujan,* 4 F.3d 858 (10th Cir.1993). In other words, the information available must be sufficient to establish a claim on behalf of the government.

■ Further, it is crucial that those facts be known to a government official who is charged with sufficient responsibility to take action under the circumstances. The claim will accrue when "the government . . . [has] actual knowledge of the facts underlying . . . its causes of action". *U.S. v. Inc. Village of Island Park,* 791 F.Supp. 354, 370 (E.D.N.Y. 1992).

■ The time when "the government is unaware of facts material to its right of action" will be excluded. *Phillips,* 4 F.3d at 862.

■ The statute does not envision that the government be privy to all particulars of a claim to be entitled to additional time. Only the key ingredients of a cause of action need be known.

Congress was not explicit about how far the tolling provision should extend. It expressed a willingness to excuse some delay caused by "the size and complexity of the Government," including in § 2416(c) the

language "reasonably could not be known by an official of the United States *charged with the responsibility to act in the circumstances*". This clause recognizes, as a practical matter, that knowledge of a cause of action at one level of government is not always immediately communicated to the particular officials charged with acting upon it. Congress could not, however, be completely forgiving of government delay and still be true to its motives in enacting a statute of limitations. Therefore, it is not necessary that relevant officials have all details of a claim before the statutory period begins to run; once the facts making up the "very essence of the right of action" are reasonably knowable, the § 2416 bar is dropped.

*United States v. Kass,* 740 F.2d 1493, 1497 (11th Cir.1984) (citations omitted). *See also U.S. v. Gov't Dev. Bank,* 725 F.Supp. 96, 100 (D.P.R.1989).

The public policy behind the provision extending the prescriptive period is to allow sufficient opportunity for the government to become aware of potential claims given the inherent "[d]ifficulties of Government operations due to [its] size and complexity". *U.S. v. Gov't Dev. Bank,* 725 F.Supp. at 100 (citing legil. hist.)

 However, § 2416(c) does not extend the statutory period indefinitely during all the time the government is unaware of the underlying facts. The statute imposes a duty of diligence on the part of the government to ascertain facts material to its right of action. It specifically limits the tolling to those instances "when the government could reasonably have known about the violation." *Phillips,* 4 F.3d at 862. The government must bring suit within six years "of its reasonable knowledge of the claim". *Kass,* 740 F.2d at 1499. In other words, the term will be extended if the failure to detect a cause of action was due to "excusable ignorance" on the part of the government. *Id.* at 1497.

 However, the litigation period cannot be extended if the delay has been caused by the government's own inefficiency and/or lack of diligence.

To satisfy Congressional intent, district courts should not view a failure to exercise reasonable diligence, inconvenience, and even some hardship on the part of the government as grounds for tolling the limitations period.

*Phillips,* 4 F.3d at 863.

In other words, the theory of the difficulties of operations due to the government's size and complexity is provided for in the extended statutory period and is not meant to be invoked anew after the expiration of the period as a means of minimizing the government's inefficiency or lack of diligence.

## V. PARTIES' ARGUMENTS RE: TOLLING

STELLA contends that the tolling ceased **no later than July 1979** which would render the claims untimely. He further argues that crucial information as to the underlying facts was or should have been detected on or before that date by the following persons and/or events:

1. MARK LEVINE and May 1979 REPORT;

2. BLUE CROSS audits;

3. Inventory inspections;

4. JOSE FEBRES SILVA; and

5. July 1979: Default and Bankruptcy.

Plaintiff on the other hand alleges that it was not at least until **December 1980,** when an audit was prepared by HUD's Office of Inspector General ("OIG"), that the government was first put on notice of STELLA's fraudulent scheme. The government justifies the delay in bringing suit by claiming that defendant, through misrepresentations and false documentation, concealed his fraudulent operations to divert HUD mortgage insurance funds.

We shall first address the five factors named by defendant in the same order listed above except for the inventory inspections which will be discussed last. Thereafter, we shall review plaintiff's position regarding the tolling of the statute of limitations.

## A. DEFENDANT[5]

### 1. Irregularities Discovered in 1975–77 by MARK LEVINE May 1979 Report and Denial of Operating Loan Loss

■ Defendant points to certain mortgage irregularities noticed by MARK LEVINE[6] from 1975 through July 1979 as the starting point for the limitations period. These activities were further confirmed in a May 1979 feasibility study commissioned by MR. LEVINE for the purpose of evaluating a petition for an operating loan submitted by the hospital. The operating loan application[7] was eventually rejected based on the following infringements delineated in the Report:[8]

1. Improper advances to BEVERLY HILLS NURSING HOME, an affiliated company;
2. Absence of a "sinking fund";
3. Excessive finder's fee; and
4. Factoring of accounts receivable.

We have examined the nature of these irregularities and find that they do not form the basis of the outstanding claims asserted in these pleadings nor do they bear any resemblance thereto. The overpricing allegation is based on facts arising from the insider benefit conferred through business dealings with AAA and CASA CARDONA, purported providers of hospital equipment. These two entities in no way appear connected to the BEVERLY HILLS NURSING HOME in the Report. Further, the fraudulent scheme involving the purchase of equipment is not analogous to the deviation of funds to the nursing home which could somehow trigger a reasonable inference of additional wrongdoing through related entities. The nursing home stratagem was in no way associated with STELLA's equipment venture nor should it have alerted plaintiff to any further misconduct defendant STELLA may have been engaged in with respect to the misuse of mortgage funds in other endeavors. Further, the other matters mentioned in the Report, i.e., excessive finder's fee, failure to maintain certain funds and factoring of accounts receivable are practices which constituted violations of the mortgage agreement which bear no similarity with the *modus operandi* utilized by defendant in relation to the purchase of hospital equipment charged in the complaint.

None of these activities have any connection with the overpayment and/or missing hospital equipment which is the essence of the claims asserted in these proceedings. The matters contained in the Report address mismanagement of mortgage funds but in no way would it alert one to a separate scheme devised by defendant to submit false invoices for equipment through dummy corporations.

Thus, it cannot be argued that facts underlying the irregularities known to MR. LEVINE and/or included in the Report constitute "facts material" to the unjust enrichment and/or payment by mistake claims based on misuse of mortgage funds to pay overpriced or missing hospital equipment.

### 2. Blue Cross Audits—1977–78

■ Defendant further points to activities detected by audits of the Hospital's Medicare claims conducted by BLUE CROSS of Florida.[9] The purpose of these audits was to determine whether or not the cost reports submitted by the hospital at the end of the year were "reasonable and accurate". ESTRADA Tr. 1385.

---

5. All references to transcript pages pertain to testimony furnished at the criminal proceedings held against STELLA which were attached as Exhibits to Defendant's Memorandum of Law ... (docket No. 116).

6. MR. LEVINE was a loan management officer for the FHA Section 242 Mortgage Insurance Program within the Department of Health Education and Welfare ("HEW") subsequently renamed Department of Health and Human Services ("HHS").

7. The hospital requested from HUD an operating loss loan in the amount of $1.7 million in June 1978.

8. *See* LEVINE Tr. 214.

9. BLUE CROSS was acting as fiscal agent for the hospital's Medicare Program. As such, it was responsible for payment of services; receipt of cost reports and entering into final settlements of cost reports. ESTRADA Tr. 1348; RAMOS Tr. 1384.

In a 1977 audit JAIME ESTRADA DIAZ[10] noticed a lease agreement for certain offices owned by HATO REY REALTY, a "related organization" in violation of the "Hospital Insurance Manual". ESTRADA Tr. 1365.

Thereafter, while conducting an audit in 1978 BLUE CROSS senior auditor DAVID RAMOS USERO discovered invoices contained in the back of certifications from CASA CARDONA and AAA which were signed by JOSE CARDONA, the "sub-administrator" and purchasing agent for the hospital as well as a stock subscriber to the hospital. RAMOS USERO Tr. at 1391-93.

The following is the explanation provided at trial by MR. RAMOS USERO of how he discovered the relationship between hospital officials and the two corporations.

> A. When I was examining these certification [sic] I noticed that there were invoices contained in the back of the certification from Casa Cardona and AAA Hospital Supply, and those invoices were signed by Mr. Joe Cardona. When I noticed those names, and also the names of the companies which for [sic] in my experience in hospitals, was the first time I saw those companies making business, I started questioning who were those companies, and I noticed there was a person by the name of Jose Cardona working at the Hospital, so I started questioning and questioning, and I went and I ask [sic] who was Mr. Cardona in the Hospital.

RAMOS USERO Tr. 1391.

At the exit conference held in July 1978 hospital representatives were notified of the aforementioned related organization situation and advised that adjustments to the cost reports would be made accordingly. RAMOS USERO Tr. at 1395-98.

Thereafter, MR. RAMOS USERO reviewed the Department of State records and discovered that STELLA appeared listed as president of both CASA CARDONA and AAA. RAMOS USERO Tr. 1398-1402. Thus, an additional personal connection to the hospital was detected which triggered yet another link to a related organization.

Hospital representatives were confronted with these findings and as a result thereof BLUE CROSS adjusted the hospital's 1976-77 cost reports by deducting 20%-25%[11] RAMOS USERO Tr. 1403-04.

Defendant contends that by the July 1978 exit conference the government, "through Blue Cross ... personnel acting as its agents, knew or through diligent investigation could have known, facts material to its claims that equipment for the hospital was being purchased improperly at inflated prices ..." Defendant's Memorandum of Law ... at 43.

However, according to the evidence before us, there is no indication that government personnel were either involved in any of the BLUE CROSS audits or that information of the relationship between STELLA/CARDONA and CASA CARDONA and AAA went beyond BLUE CROSS prior to the 1980 HUD's OIG Report.

Further, the purpose of these audits was limited to identifying possible violations of the Medicare Program not potential infractions of HUD mortgage payments. As a matter of fact, BLUE CROSS did take corrective action to deal with the violations within the purview of the Medicare directives through deductions in the cost reports. No evidence has been presented to establish that these findings of related entities went beyond the remedial actions taken by BLUE CROSS.

### 3. JOSE FEBRES SILVA

■ Defendant makes a giant leap and concludes that JOSE FEBRES SILVA, Area Manager of HUD and former Deputy Area Director and Regional Counsel, should have known about the scheme involving the equipment because of his testimony at trial to the effect that prior to the default there were "signs of difficulties with the compliance of the loan" which caused him "serious reservations" as to whether defendant would be

---

**10.** Audit and Reimbursement Supervisor for BLUE CROSS.

**11.** It is not clear from the testimony the exact percentage discounted since both 20% and 25% are mentioned in different parts of the transcript.

eligible for another HUD loan. Defendant' Memorandum of Law ... at 47.

Based on this brief remark defendant arrives at the following conclusion:

> There is no further testimony as to the specifics of Febres' knowledge, but it seems safe to assume that the basis for the same was that he was privy to at least some of the gross irregularities and mismanagement described above. Moreover, Febres, as an attorney, was in a position to know the legal ramifications of the loan irregularities.

*Id.* (footnotes omitted).

We do not see the logic behind this argument. These comments came as a response to questions posed at the criminal trial in discussions held with STELLA regarding additional HUD-secured loans for other projects, including a housing development. A generalized reference to "difficulties" in making the hospital mortgage payments does not even tangentially touch upon the facts underlying the complaint filed in this action.

### 4. July 1979: Default and Bankruptcy

■ Defendant further argues that the administrative irregularities and practices known by July 1979 were sufficient to put the government on notice of its claims and trigger its duty to investigate diligently.

> The need for diligent investigation (which had been apparent since 1975) certainly became crystal clear in July 1979, when, one month after the $1,700,000 operating loss loan was denied, the hospital defaulted on the Mortgage and filed for bankruptcy ... At the very latest, it was at this point that the statute of limitations for the claims set forth in counts II and III of the complaint commenced to run.

Defendant's Memorandum of Law ... at 48.

We find this argument unconvincing. As previously discussed, according to the 1979 Report commissioned by LEVINE, the financial difficulties encountered by the hospital stemmed from conduct which did not directly relate to defendant's fraudulent scheme involving equipment. Accordingly, it cannot be presumed to have given notice to the government for limitations purposes.

### 5. Inventory Inspections

■ Pursuant to the terms of the mortgage agreement, part of the proceeds were paid to the government as inspection fees to monitor the construction project and equipment purchases.

HECTOR LOPEZ, Loan Specialist for HUD in charge of verifying applications disbursement of the mortgage insurance funds for the hospital testified that an inspection fee based on the amount of the loan was charged. MR. LOPEZ further indicated that the inspection fee charged in this particular case was **$62,000.** LOPEZ Tr. 340 and 398. These monies were collected by HUD and transferred to HEW, the agency responsible for conducting the inspection. LOPEZ Tr. 338 and 399.

In particular, MR. LOPEZ testified as follows:

Q. What's the inspection fee charged for?

A. The inspection fee is charged for the inspection that is going to be made by the people from HUD or DHHS to that project.

. . . . .

Q. Now, what do you mean by inspect?

A. Well let me start by this, this inspection fee will be collected by DHHS not by HUD, in the case of a Hospital, and that is the responsibility of DHHS making those inspections.

Q. Who collects them?

A. We collect and pass them to DHHS.

Q. So DHHS ...

A. Remember I said in my previous explanation here that FHA is a servicer on this loan.

Q. And what does that mean, that you are a servicer of a loan?

A. That is that we are the guarantors, we approve the, we guarantee the loan that DHHS says that we are going to approve.

Q. And what do you do as a servicer?

A. Well we are in charge of making disbursements of the loan approved.

LOPEZ Tr. 338–339.

As confirmed by MR. LEVINE, even though physical inspections to verify equip-

ment purchases were supposed to have been made since **1975**, when the advances for equipment began during the construction period, none, in fact, were made prior to **June 1977** when only the escrow funds remained for distribution.

Q. Mr. Levine, in the course of the mortgage with reference to the equipment purchase by the hospital, what if any inspections were made of the equipment for which the hospital submitted invoices?

A. We have an agency in the Department of Health and Human Services called the Regional Office of Facilities Construction Agency, and they have the responsibility to make site visits to the facility during the construction period, and at the completion of the construction when the project was finished, there was a physical inspection of all the equipment in the hospital.

Q. Now, in the course of this construction did the Regional Office made (sic) such inspection on the advance of the mortgages?

A. I do not believe so.

LEVINE Tr. 169.

MR. LOPEZ confirmed the failure to carry out the mandated inspections.

Q. Well, do you know if during the life of this project, this construction project, whether HUD or HEW, or its successor DHHS ever did anything to earn its inspection fee?

A. Well, I may recognize that during the beginning of the project there was no inspection at all, but at the end of the project Mr. Rolando Ortiz from DHHS went to make inspections for the equipment in the project.

LOPEZ Tr. 345.

Only after **June 1977** did MR. ROLANDO ORTIZ go to the construction project two or three times to verify that the equipment identified in the escrow requests was on site. LOPEZ Tr. 348.

The following narrates his version of the events.

Q. Let's see if we can pinpoint that as to time.

The contract was extended, the loan was extended to $12,459,100 dollars on April 8, 1976?

A. That's right.

Q. Up to that time is it true, is it not, that approximately 8 and a half million dollars had been disbursed?

A. That's right.

Q. And up until that moment of time, that is April 8, 1976, there had been not one single inspection of anything by HUD?

A. Not one single inspection of the equipment.

. . . . . .

Q. Did you, and then when was the time you say that the escrow agreement was setup?

A. That was after final closing, that was by June 1977.

Q. All right, now by June of 1977, everything had been disbursed, had it not, except for $587,520 dollars, so as of June of 1977, had HUD sent any inspectors to the building?

A. Up to that date, no after that date, yes.

Q. Up to that, after that date, only for the equipment?

A. For the equipment.

Q. That was to be purchased under the escrow agreement?

A. That's right.

Q. But up to that date was not the sum of $1,900,000 in equipment already in the building?

A. Yes Sir, funds were disbursed from mortgage proceeds to purchase equipment before.

LOPEZ Tr. 397–8.

It is evident from the uncontested testimony provided at the criminal trial that since **1975** government personnel were charged with the responsibility of verifying that new hospital equipment was in the premises and to ensure that the mortgage proceeds destined for equipment were being properly disbursed. It is also obvious that no attempt was made prior to **June 1977** to corroborate the accuracy of the billings and certificates

submitted for equipment paid with the mortgage monies.

We find that the government was derelict in not noticing that equipment was missing. The testimony presented at the criminal trial was clear in establishing an obligation on the part of the government to ensure that the equipment purchased with mortgage funds was indeed in the hospital. Additionally, the debtor paid a substantial amount of monies for these services and yet the government openly concedes a total neglect of this duty. The government's conduct, under these circumstances, cannot possibly justify its ignorance as "excusable". Its failure to ascertain the absence of tangible items was due exclusively to the government's own lack of diligence.

The government cannot in good conscience request an extension of the tolling provisions when it made no attempt whatsoever to confirm the veracity of the equipment documentation particularly when the applicable statute of limitations is already quite extensive to allow for the "inherent difficulties of government operations due to [its] size and complexity." It is important to bear in mind that we are not dealing with a brief statutory period. Quite the contrary, the limitations provision allows the government six full years to become aware of facts comprising a cause of action and to institute suit. The government cannot hide behind generalized allegations of fraud as an excuse to extend this period since it had an obligation to carry out inspections and the underlying charged conduct was readily verifiable.

Had the government conducted the inspections as required, it would have also opportunely detected the common identity of the hospital officers with those of AAA and CASA CARDONA the same way BLUE CROSS was able to do. MR. LOPEZ testified that "all of the equipment that could have been identified in the invoices accompanying the escrow request should have been personally inspected and verified by an DHHS Inspector". LOPEZ Tr. 348. Yet, up to 1977 no single inspection for equipment had been carried out; only a review of the documents submitted were made. LOPEZ Tr. 397.

Since the regulatory inspection included examining the invoices, information of the related entities would have become apparent with the name of CARDONA, purchasing agent for the hospital, conspicuously appearing in the vouchers. This information, coupled with the missing equipment, would have reasonably lead the government to detect a related entity situation and undoubtedly raise a suspicion of the pricing scheme in a timely fashion just as BLUE CROSS had done.

▮ Plaintiff contends that only Department of Justice ("DOJ") attorneys were empowered to act under the statute for purposes of the limitations period and that they had no notice of the illegal acts until completion of the HUD audit in 1980. We disagree. The alleged role of the DOJ is a conclusory allegation without any support in the record. *See, e.g., Jankowitz v. U.S.,* 533 F.2d 538 (Ct.Cl.1976) (action for bribery and kickback scheme where the court had before it an uncontroverted affidavit submitted by the government justifying its position regarding the role of the DOJ for limitation purposes).

The statute does not require that the official charged with responsibility be a high ranking officer but only that he have authority to act under the circumstances. *See, e.g., U.S. v. Boeing,* 845 F.2d 476 (4th Cir.1988), *rev'd on other grounds sub nom. Crandon v. U.S.,* 494 U.S. 152, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990), where the court rejected as conclusory the allegations asserted by the government that the contracting officer was the first with knowledge of critical facts and ability to recognize a conflict of interest situation. The problem had been previously identified by the defense contracting agency and no explanation was proffered to explain why it arguably had no responsibility to act.

That official, according to the Justice Department, was the DOD contracting officer for Boeing who learned the relevant facts in a memo from the DCAA on March 26, 1982. The government fails to explain, however, why DCAA employees charged with auditing responsibilities were not charged with responsibility to act here. Conclusory statements that the contracting

officer was the first official with the knowledge and ability to recognize a conflict do not justify tolling the statute under § 2416(c) and are refuted by the fact that DCAA employees and managers recognized that a problem existed. The decision to refer that problem to the contracting officer does not diminish their ability to act.

*Boeing* 845 F.2d at 482.

■ Nor is a criminal investigation required for the statute of limitations to start anew. In *U.S. v. Kensington Hosp.*, No. 90–5430, 1993 WL 21446 (E.D.Pa. Jan. 14, 1993) the court found that receipt by government agents of a report commissioned by the hospital to investigate possible embezzlement by its employees triggered the limitations period. The report specifically pointed to fraudulent Medicaid billings or excess reimbursements, listed several schemes utilized by personnel and recommended a thorough investigation. The court rejected arguments that otherwise facts material to a claim were not known until the conclusion of a subsequent criminal investigation.

The testimony during the criminal proceedings revealed that HEW was delegated the responsibility to oversee the hospital equipment precisely because of its particular expertise in the health area. It is evident that the Regional Office of Facilities Construction Agency which was responsible for verifying matters related to the new equipment was knowledgeable enough to discern a colorable claim on behalf of the government for missing equipment. Although all the details of the fraudulent scheme may not have been readily apparent at the time of the required inspection, the key ingredients for such a cause of action were obviously present. Further, since approval of mortgage funds was contingent upon the accuracy of the information provided in the payment requests, an adequate inspection by HEW

would have also alerted HUD personnel responsible for issuing payment as to the existence of a claim.

In sum, we are dealing with a situation of total neglect by both HEW and HHS. Under these circumstances, the government cannot be heard to complain for its own lack of action.

**B. PLAINTIFF**

Plaintiff argues that STELLA's fraudulent concealment of his scheme to divert mortgage proceeds through intentional misrepresentations and false documentation extended the limitations period until at least **December 1986** when the audit prepared by OIG first identified STELLA's schemes involving hospital equipment.[12]

■ Initially, a Survey Report issued on **April 15, 1980** was prepared by OIG. The Report was addressed to JOSE E. FEBRES–SILVA, HUD's Area Manager, San Juan. It was prompted by the hospital's poor economic performance and its purpose was for HUD to determine whether or not to request the Bankruptcy Court to appoint a receiver and if additional investigation was warranted.

The Survey Report did recommend the appointment of a receiver and an in-depth audit to determine if legal action was warranted. However, the irregularities noted in the Report[13] did not mention either AAA or CASA CARDONA nor was there any indication of phantom purchases or fraud related to hospital equipment. Thus, this document cannot be regarded as providing notice to the government for limitation purposes.

Plaintiff has also submitted a document entitled Report on Mortgagor Operations Audit ("AUDIT") prepared by OIG which is stamped with a DRAFT marking. Although undated, the first page indicates that "[t]he

12. Defendant attacks the probative value of the documents presented by plaintiff alleging *inter alia* that the 1980 Audit is a DRAFT and there is no indication as to previous drafts and because part of the underlying documentation reviewed during the OIG investigation had not been provided to him. Since we have concluded that the government could have reasonably known about these facts at an earlier date, we need not address these objections.

13. The problem areas were identified as: (1) factoring of accounts receivable; (2) loans to BEVERLY HILLS NURSING HOME, INC.; (3) finder's fees; and (4) disbursements subsequent to filing of bankruptcy petition.

audit began on **July 9, 1980** and was completed **December 12, 1980**" which implies that it was issued not earlier than **December 1980.**

The practices charged in the complaint before us are clearly delineated under *"Finding 3—Equipment Purchased From Identity-of-Interest Companies Was Not Located or Was Overpriced ..."* of the Audit which in pertinent part reads:

> The mortgagor used mortgage proceeds to purchase equipment from two identity-of-interest companies. A partially complete inventory coupled with a detailed review of invoices submitted by the two identity-of-interest companies (hereinafter referred to as Corp. A and B) showed that (a) $386,-447.40 in equipment was missing; and (b) Mortgagor paid $2,385.80 in excess of what the equipment cost. As a result, HUD overinsured the mortgage by $388,833.20.

> In addition, the Mortgagor was unable to provide sufficient documentation to establish the eligibility of $32,108.89 in costs. Further, the Mortgagor's completion of the physical inventory could disclose that additional items of equipment are missing thereby increasing the disallowable costs and increasing the amount by which HUD overinsured the mortgage.

> ... The Mortgagor's certificate stated that $1,675,487 had been paid in cash for equipment and that $876,369 was to be paid in cash within 45 days after final endorsement for a total of $2,551,856. The Mortgagor did not disclose the identity of interest with the equipment supplier which would have caused HUD to limit the Mortgagor's equipment costs to the actual costs incurred by the equipment supplier.

> At (sic) December 31, 1978 the Mortgagor's equipment purchases totaled $2,343,-900 of which $1,878,169 or approximately 80 percent was acquired from Corps. A and B. Secretary of State records disclosed that a former Hospital employee and stockholder was the President and Resident Agent of Corp. A and resident Agent of its subsidiary, Corp. B.

. . . . .

A. *Missing Equipment $386,447.40*

> At our request, the Operating Receiver directed Mortgagor personnel to conduct a physical inventory of equipment to correct a previous incorrect inventory. We furnished Mortgagor personnel a complete set of equipment invoices because the Mortgagors invoice file was incomplete. At the completion of our field study, Mortgagor personnel had yet to complete the physical inventory. However, sufficient verification had been completed to disclose that $386,447.40 in equipment was missing from the Mortgagor's premises.

Audit at 13–14.

Thus, this investigation undoubtedly provided the government with clear notice of the claims asserted in these proceedings. However, as previously discussed, the government could have reasonably known about this conduct at a much earlier time which is further confirmed by the clear wording of the Audit.

The findings of missing equipment and overpricing in the Audit are based on "a partially complete inventory coupled with a detailed review of invoices". This is precisely what the Regional Office of Facilities Construction Agency within HEW was supposed to be doing during the entire period mortgage funds were being disbursed. However, no explanation has been proffered for the complete government inaction. According to the Audit the incomplete inventory "disclose[d] that $386,447.40 in equipment was missing from the Mortgagor's premises." This validates our findings that had the government complied with its obligations to regularly inspect the equipment purchased with mortgage funds it would have certainly been alerted to this information in a timely fashion. Simply put, the government's failure to become aware of the fraudulent scheme within the six years required by the statute is due exclusively to its own neglect.

The government's persistent lack of diligence distinguishes this case from *Phillips* which involved a claim based on unpaid royalties. In *Phillips* the court noted that the claim accrued when the underpayment took place. However, it stressed the fact that the government could not be alerted to facts

material to the underpayment unless an audit was completed and proceeded to extend the limitations period until its conclusion. Arguments raised by defendant of stale claims were countered by the fact that documents were required to be saved only for a period of six years which forced the government to be diligent in investigating possible claims within a reasonable time frame.

The situation before us is different. Not only did the government fail to act diligently but also the missing equipment was an evident fact subject to required government inspections and not contingent upon an audit.

Similarly, in *U.S. v. Gov't Dev. Bank* where the court found that the limitations for a food stamp fraud claim began to run on the date of the arrest and not while the operation was under investigation, the court specifically noted that the government was diligent in its investigation and actively attempted to uncover the fraudulent scheme through aggressive surveillance.

Here, the complaint charges conduct since 1975 through 1978 which indistinctly contains claims for both improper disbursements and missing equipment throughout all this period of time. However, as previously discussed, timely inspections would have alerted plaintiff of the missing equipment and related corporations long before 1978. Thus, we reject plaintiff's argument that the Audit constituted, at best, the earliest onset for the tolling provisions.

## VI. CONCLUSION

The court having reviewed the memoranda filed by the parties [14] hereby concludes that the remaining claims in the complaint are barred by the six-year statute of limitations.

Accordingly, COUNT II and COUNT III of the complaint are hereby **DISMISSED** as untimely.

14. *See* Defendant's Memorandum of Law ... filed on February 14, 1996 (docket No. **116**); Motion Submitting Certified Court Translations, filed by defendant on March 8, 1996 (docket No. **117**); and Plaintiff's Reply to Defendant's Memorandum of Law ... filed on March 8, 1996 (docket No. **118**).

Judgment shall be entered accordingly.

IT IS SO ORDERED.

Defendant's Motion Requesting Leave to File Surreply, filed on March 14, 1996 (docket No. **119**) is **DENIED as MOOT.** *See also* Plaintiff's Opposition to Defendant's Motion for Leave to File Sur-Reply, filed on March 25, 1996 (docket No. **120**).